[Cite as *State v. Connally*, 2016-Ohio-7573.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                      :

      Plaintiff-Appellee,                      :                    No. 16AP-53
                                                                                      (C.P.C. No. 15CR-1241)

v.                                                         :

                                                                                      (REGULAR CALENDAR)

Jahmez L. Connally,                            :

      Defendant-Appellant.                   :

---

D E C I S I O N

Rendered on November 1, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Valerie Swanson*, for appellee.

**On brief:** *Peterson, Conners, Fergus & Peer LLP*, *Gregory S. Peterson,* and *Istvan Gajary*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Jahmez L. Connally, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of one count of aggravated burglary, two counts of aggravated robbery, four counts of robbery, and two counts of kidnapping, all with specifications. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed March 13, 2015, plaintiff-appellee, State of Ohio, charged Connally with one count of aggravated burglary in violation of R.C. 2911.11, a first-degree felony; two counts of aggravated robbery in violation of R.C. 2911.01, first-degree felonies; two counts of robbery in violation of R.C. 2911.02, second-degree

felonies; two counts of robbery in violation of R.C. 2911.02, third-degree felonies; and two counts of kidnapping in violation of R.C. 2905.01, first-degree felonies. All nine counts in the indictment contained accompanying firearm specifications. The charges related to a home invasion at Shannon Green Drive in Columbus. Connally entered a plea of not guilty.

{¶ 3} At a jury trial commencing November 30, 2015, D.W. testified she was living at her mother's apartment in January 2015 along with her mother, step-father, and brother. D.W. stated that on January 8, 2015 she was "lounging around" the apartment with her brother at approximately 5:00 p.m. when "a home invasion" occurred in which "[p]eople invaded [their] space and came and got [their] belongings at gunpoint." (Tr. Vol. II at 55-56.) Prior to the home invasion, D.W. stated that at approximately 3:30 or 3:45 p.m., someone knocked on the door but that D.W. was upstairs in her room and her brother answered the door. She stated her brother told her that "his friend [N.N.] wanted to borrow [her brother's] PlayStation charger cord" but that her brother did not have such a cord, and the people who knocked at the door then left. (Tr. Vol II at 58.)

{¶ 4} By 5:00 p.m. that same day, D.W. stated she was in the kitchen cooking and talking on the phone to her boyfriend while her brother was in the living room. D.W. further testified:

> And there was a knock at the door and two guys just barged in my house like through the front door and was basically fighting my brother, and my brother ended up kind of fighting with one of the guys. And I tried to run out the back door. I was kind of just standing there for a moment because I was shocked about what was happening. So I was trying to - - after I actually found out what was going on, and the guys had hoods on and stuff, okay, this is probably a robbery. And I [saw] the gun in his hand, so I tried to run to the back door, but he grabbed me.

(Tr. Vol. II at 59.) After the person with the gun grabbed her, D.W. stated he made her hang up the phone, walked her to the back door, covered her eyes, and told her to unlock the back door. While her eyes were covered, D.W. stated she heard the person with the gun telling other people to come into her house. D.W. testified that the person with the gun walked her toward the front of the house and made her sit down next to her brother,

and she saw "four people all in black" going up the steps.  (Tr. Vol. II at 63.) Approximately five minutes later, D.W. stated the person holding the gun told her and her brother to get into the closet and told them they "better have the door shut or he was going to shoot through the door."  (Tr. Vol. II at 64.)  D.W. stated she and her brother got into the closet and "that's when everybody else came downstairs and left out the back door."  (Tr. Vol. II at 64.)  After a couple of minutes, D.W. and her brother left the closet and her brother went next door to use the neighbor's phone to call 911.

{¶ 5}   D.W. testified she did not get a good look at the person fighting with her brother other than noting he was wearing a light blue jacket and camouflage cargo pants, but she stated she did get a good look at the person who charged toward her with a gun. She described the man with the gun as a black male with lighter skin, approximately 20 years old, 5 feet, 9 inches tall, and approximately 130 pounds.  D.W. stated he was wearing a black coat, a gray hooded sweatshirt with drawstrings, and gray sweatpants. When the police arrived a few minutes later, D.W. stated she gave them the same description of the individual with the gun.

{¶ 6}   The day after the home invasion, D.W. testified she went to the rental office of the apartment complex and asked to view surveillance video from the previous day. The surveillance showed a group of people hanging around the apartment complex, and D.W. stated she recognized "the one with the camouflage pants" as one of the individuals who had entered her home during the home invasion.  (Tr. Vol. II at 76.)  In the surveillance video, she also saw a person wearing a gray hooded sweatshirt and a black jacket.

{¶ 7}   D.W. testified that police asked her to try to identify the gunman from a photo lineup on January 14, 2015, but she was unable to identify a suspect from that lineup.  Police then asked D.W. to look at a second photo array on January 20, 2015. D.W. stated she circled photograph number two, which was not a picture of Connally, believing "this could possibly be the gunman," and she wrote on the photo array form "[n]one of the pictures stood out to [her] because the suspect had cat-like eyes and a mustache with a sharp nose."  (Tr. Vol. II at 81-82.)  Then, on March 4, 2015, police showed D.W. a third photo array, and this time she circled a photograph of Connally, writing that the individual "has the features of gunman and looks like gunman."  (Tr. Vol.

II at 85.)   In court, D.W. identified Connally as the gunman from the home invasion. D.W. testified she had never seen Connally before the home invasion.

{¶ 8}   L.G., who was 16 years old at the time of the home invasion and is D.W.'s brother, testified that on January 8, 2015, he was at home when his friend N.N. and two other people knocked on his door asking if they could borrow a PlayStation controller. One of the other people with N.N. was wearing camouflage pants, but L.G. did not know who he was.  L.G. stated he recognized the third person as J.B., someone with whom he attended summer school.  L.G. stated he told N.N. he did not have a PlayStation controller and the three of them walked away.

{¶ 9}   At approximately 5:00 p.m. on January 8, 2015, L.G. stated he heard a knock at the door and when he answered the door, two people pushed the door in.  He stated he tried to close the door, but the two people forced their way inside the house. L.G. stated the first person in the door was wearing camouflage pants and the other person ran into the kitchen where his sister was making dinner.  L.G. engaged in a physical struggle with the person in camouflage pants, and the other person grabbed his sister and put a gun to her head.  While he was wrestling with the person in the camouflage pants, L.G. said he recognized that person as C.F.

{¶ 10} L.G. testified that the gunman had the gun out the entire ten minutes he was in L.G.'s house and that the gun was a silver semi-automatic pistol with a black handle.  L.G. stated the gunman instructed L.G. and his sister to sit down on the couch in the living room, and they watched as four other people entered the apartment and went upstairs with C.F.  L.G. recognized one of those four people as J.B. because he was the only one who did not have his face covered up by a hooded sweatshirt.  L.G. said he could hear things moving and being thrown around upstairs, and he estimated the five people were upstairs for approximately five minutes.  L.G. testified that the gunman pointed the gun at him and his sister the entire time they were seated on the couch.

{¶ 11} When the five men ran back down the steps, L.G. said they ran immediately out of the house.  At that point, the gunman told L.G and his sister that if they moved, he would shoot them, and he told them to get in the closet and stay there or else he would shoot.  L.G. testified that he went into the closet with his sister, stayed in there for approximately one minute, and then exited the closet to see the back door open and all the

individuals gone.  L.G. stated the individuals left with two pairs of his shoes, a pair of his step-father's shoes, his headphones, and his PlayStation video game console. Additionally, L.G. stated the gunman took his cell phone and his sister's cell phone before he left the house.  After the gunman and the others left the apartment, L.G. said he ran next door to his neighbor's house to call 911.

{¶ 12} The state played the audio recording of L.G.'s 911 call for the jury.  In the recording, L.G. tells the operator "[s]omebody just broke into my house while we [were] in it and they put a gun to my face, and they took my stuff."  (Tr. Vol. II at 135-36.)  L.G. told the operator there were "six dudes" who were "all black," and he said they were teenagers.   (Tr. Vol. II at 136.)   L.G. further told the 911 operator that all of the people were wearing hoodies and that he thought he had seen one of them before.

{¶ 13} When police later asked L.G. to look at a photo array of suspects, he identified C.F. as the person who forced the door open and was wearing the camouflage pants.  At a later date, police asked L.G. to look at another photo array, and L.G. picked photo number two, writing "[n]ot positive, same facial features, looks like the guy with the gun, similar."  (Tr. Vol. II at 186.)  Photo number two was a picture of Connally.  At trial, L.G. identified Connally as the person who barged into his home and held him at gunpoint, saying he was "[p]ositive" Connally was the gunman.  (Tr. Vol. II at 190.)

{¶ 14} C.F. testified and admitted his involvement in the home invasion and, at the time of trial, was being held at the juvenile detention center.  C.F. identified Connally as the gunman in the home invasion.  C.F. stated that prior to the home invasion, he did not personally know Connally but he had "heard of him" because Connally is J.B.'s brother. (Tr. Vol. II at 211.)

{¶ 15} According to C.F.'s testimony, about one week before the home invasion he was "jumped" by approximately 30 people and someone stole his shoes.  (Tr. Vol. II at 213.)  N.N. told C.F. that he had heard that L.G. was "bragging and boasting" that he had C.F.'s shoes, so C.F. talked to N.N. about going to get the shoes from L.G.  (Tr. Vol. II at 214.)  C.F. and N.N. devised a plan to break into L.G.'s house when no one was home on the weekend, get the shoes, and leave.  J.B. agreed to help.

{¶ 16} When school was cancelled due to snow on January 8, 2015, C.F., N.N., and J.B. decided to break into the house that day because they thought L.G. would be at work.

They first knocked on the apartment door to see if anyone was home, and L.G. answered the door. After a brief conversation with L.G. about borrowing a PlayStation controller, C.F., N.N., and J.B. went to the apartment complex clubhouse to regroup and decide how to carry out their plan since they had not expected anyone to be in the apartment. At that point, N.N. had to go home, and C.F. stated that J.B. called Connally and asked him to come help them "kick the door." (Tr. Vol. II at 230.) Connally agreed to help.

{¶ 17} Approximately 10 or 20 minutes later, C.F. stated Connally arrived at the apartment complex along with another man identified only as "B." (Tr. Vol. II at 231.) C.F. stated that both Connally and "B" had guns, and that Connally's gun was an all black semi-automatic pistol while "B's" gun was a chrome semi-automatic pistol. C.F. stated that he knocked on the door and started "tussling" with L.G., and Connally went inside the house and put a gun to L.G.'s sister's head. (Tr. Vol. II at 237.) When C.F. eventually went upstairs to grab some items and then left the house, he stated he heard Connally tell L.G. and D.W. to "[g]et in the closet, don't move and don't come out before we leave. If you come out before we leave I'm going to come back and kill you." (Tr. Vol. II at 243.)

{¶ 18} The next day at school, police arrested C.F. on unrelated robbery charges. C.F. pled guilty in that case in juvenile court. The state also charged C.F. for his involvement in the home invasion at L.G.'s apartment. He entered a guilty plea to aggravated burglary, aggravated robbery, and accompanying firearm specifications. In exchange for his plea agreement, C.F. agreed to testify against Connally, and he stated he understood that if he did not provide truthful testimony, he could be bound over to the general division of the common pleas court for sentencing.

{¶ 19} James Howe, a detective with the Columbus Division of Police, testified that as part of his investigation into the home invasion, he examined Connally's cell phone. Over defense counsel's objection, the state introduced into evidence ten photographs appearing on Connally's phone between January 31 and February 16, 2015. Some of the photographs showed Connally holding two guns, one of which was a silver and black semi-automatic pistol. Other photographs were close-ups of the gun on a table or in someone's hand taken at various angles. In one of the photographs, Connally is holding the silver and black pistol and aiming it directly at the camera.

{¶ 20} Phillip Thomas, a detective with the Columbus Division of Police, testified that he saw Connally at juvenile court on March 4, 2015 for J.B.'s court date, just after L.G. and D.W. identified Connally in a photo array as the gunman from the home invasion. Detective Thomas arrested Connally at that point. Detective Thomas then interviewed Connally later that day, and Connally admitted to going to the victims' apartment complex that day to drop J.B. and C.F. off, and he admitted to picking them up later. When Detective Thomas asked Connally whether he owned or possessed a gun, Connally responded "[h]uh-uh." (Tr. Vol. IV at 513.) Detective Thomas stated that C.F., J.B., and N.N. have all entered guilty pleas related to their involvement in the home invasion.

{¶ 21} At the conclusion of trial, the jury returned guilty verdicts on all counts and specifications. Following a January 8, 2016 sentencing hearing, the trial court sentenced Connally to an aggregate prison term of nine years. The trial court journalized Connally's convictions and sentence in a January 15, 2016 judgment entry. Connally timely appeals.

## II. Assignments of Error

{¶ 22} Connally assigns the following errors for our review:

[1.] The trial court erred by admitting photographs M1 through M10 into evidence.

[2.] The trial court's finding of guilty was against the manifest weight of the evidence and was not supported by sufficient evidence.

## III. First Assignment of Error – Evidentiary Rulings

{¶ 23} In his first assignment of error, Connally argues the trial court erred when it admitted ten photographs, exhibits M1 through M10, into evidence. Police obtained the pictures from Connally's cell phone. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 24} A brief description of the photographs aids our analysis. In photograph M1, Connally is seen in the driver's seat of a vehicle holding two firearms, one of them a black and silver pistol and the other a black revolver. Photograph M2 shows Connally standing up holding a black pistol in one hand and a black revolver in the other hand. Photographs M3, M4, and M9 are close-up photographs of a black and silver pistol on a wooden surface. Photographs M5, M6, and M10 are close-up photographs of a black and silver pistol in someone's hand. Photograph M7 depicts Connally holding two black and silver pistols, one in each hand, and looking down at the weapons. Finally, photograph M8 depicts Connally holding two black and silver pistols, resting one gun against his cheek and aiming the other gun directly at the camera.

### A. Unfair Prejudice

{¶ 25} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Connally argues that the trial court's admission of the photographs contained in exhibits M1 through M10 was in error because the photographs were inflammatory and not relevant to whether or not Connally participated in the home invasion. Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 26} " 'If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word "unfair." ' " *State v. Crotts*, 104 Ohio St.3d 432, 2004-Ohio-6550, ¶ 24, quoting *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172 (2001). Thus, " '[u]nfair prejudice is that quality of evidence which might result in an improper basis for a jury decision.' " *Id.*, quoting *Oberlin* at 172. Evidence may be unfairly prejudicial if it " 'arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish.' " *Id.*, quoting *Oberlin* at 172. Often, though not always, evidence is unfairly prejudicial if it appeals to the jury's emotions rather than the jury's intellect. *Id.*

{¶ 27} Fairness is subjective and thus the determination of whether evidence is unfairly prejudicial is left to the sound discretion of the trial court. *Crotts* at ¶ 25, citing *State v. Robb*, 88 Ohio St.3d 59, 68 (2000).

### 1.  General Relevancy

{¶ 28} Initially, Connally argues none of the photographs are relevant because there was no testimony that Connally did not own a gun, just that he did not have a gun with him on the day of the home invasion.  However, in the audio recording of Detective Thomas' interview with Connally, Detective Thomas specifically asked Connally whether he owned or possessed any guns, and Connally indicated he did not.  Additionally, L.G.'s testimony established that the gunman brandished a black and silver pistol.  All ten of the contested photographs depicted a pistol matching that description.  Thus, we agree with the trial court that the photographs of the guns are relevant to proving whether Connally owned or possessed a gun and whether the gun he possessed matched the description of the one used during the home invasion.  We next examine each photograph individually to determine whether the trial court abused its discretion in determining the photographs were not unfairly prejudicial.

### 2.  Photographs M1 and M2 – Connally Holding Pistol and Revolver

{¶ 29} Photographs M1 and M2 show Connally holding two guns.  One is a black and silver pistol, matching the description of the weapon used by the gunman in the home invasion, and the other is a black revolver.  Connally argues these pictures are unfairly prejudicial because they show him holding a gun that indisputably was not used in the commission of the crimes.  In support, Connally relies on the Fifth District's decision in *State v. Hewitt*, 5th Dist. No. 2014CA00078, 2015-Ohio-1786, in which the Fifth District Court of Appeals concluded "photos of other guns were not relevant" and "were not entered to rebut argument by" the defendant.  *Hewitt* at ¶ 56.

{¶ 30} However, Connally's argument ignores that these photographs also show him holding a weapon matching the description of the weapon used during the home invasion.  Thus, we find Connally's reliance on *Hewitt* misplaced.  Here, the trial court had to reconcile the danger of any unfair prejudice of the jury seeing Connally holding a weapon not used in the crimes with the highly probative value of seeing him hold a weapon matching the description of the gun used in the crime.  We agree with the trial court that these photographs were not unfairly prejudicial, and, thus, the trial court did not abuse its discretion in admitting photographs M1 and M2.

### 3. Photographs M3, M4, M5, M6, M9, and M10 – Close-Up Photos of Pistol

{¶ 31} Connally does not articulate a specific argument with respect to the photographs showing only a close-up picture of a black and silver pistol either on a table or in someone's hand. Generally, Connally argues these photographs are unfairly prejudicial, but we do not agree. The photographs are relevant in that they show a weapon matching the description of the weapon used in the home invasion and Connally told police he did not own or possess any weapons. Further, because Connally does not appear in these photographs, we do not find, and Connally does not articulate, any unfair prejudice to Connally from these photographs. Thus, the trial court did not abuse its discretion in admitting photographs M3, M4, M5, M6, M9, and M10.

### 4. Photographs M7 and M8 – Connally Holding Two Pistols

{¶ 32} Photographs M7 and M8 show Connally holding two pistols, each of them silver and black and, thus, matching the description of the weapon used in the home invasion. Despite the relevance of these pictures, Connally argues they are nonetheless unfairly prejudicial because they allow the jury to imagine him committing the crime once they see a picture of him holding a pistol.

{¶ 33} Connally relies on the Sixth Circuit Court of Appeals' decision in *United States v. Hendrix*, 6th Cir. No. 94-1404 (Apr. 12, 1995). In *Hendrix*, the defendant was charged with possession of cocaine with intent to distribute and carrying a firearm during a drug trafficking crime. Over the defendant's objection, the prosecution introduced into evidence a photograph showing the defendant, who is black, along with three other black men. One of the men in the photograph was holding money fanned out in front of him and another man was making a gang sign. The Sixth Circuit noted that the defendant was neither the person holding the money nor the person making the gang sign, but the photo implied that the defendant was involved in gang activity. Because there was no allegation that the defendant committed the crimes as part of gang activity, the Sixth Circuit concluded there was no connection between the photo and the crime charged. Additionally, the Sixth Circuit stated "the photo seems intended to appeal to jurors' prejudices about the young black men, rather than to their disinterested judgment of [the defendant's] guilt or innocence of the charged crimes." *Hendrix* at 5.

{¶ 34} Connally argues that, like *Hendrix*, the photographs bear no connection to the crimes he was alleged to have committed. Instead, Connally argues that, like *Hendrix*, the photographs were intended to appeal to racial biases about black men. We disagree with both arguments. First, as we have repeatedly noted, these photographs were highly relevant. They showed Connally holding a gun matching the description of the weapon used in the home invasion even though Connally told Detective Thomas he did not own or possess any guns. Thus, unlike *Hendrix*, the photographs here had a direct connection to the crimes charged. Additionally, there is nothing in the record about the racial makeup of the jury, and Connally does not identify anything in the record to support his claim that these photographs were intended to appeal to the racial prejudices of the jury. Because these photographs were relevant and not unfairly prejudicial, we conclude the trial court did not abuse its discretion in admitting photographs M7 and M8.

{¶ 35} Having concluded the trial court did not abuse its discretion in admitting into evidence photographs M1 through M10, we overrule Connally's first assignment of error.

## IV. Second Assignment of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 36} In his second and final assignment of error, Connally argues his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

### A. Sufficiency of the Evidence

{¶ 37} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 38} Though Connally captions his argument as a challenge to both the sufficiency and manifest weight of the evidence, his entire argument under this assignment of error relates to the credibility of the witnesses. However, "in a sufficiency of

the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4. The sole issue at trial was one of identity. Connally does not raise any arguments related to the state's failure to prove any specific element of any of the crimes charged but instead argues the evidence the state relied on to prove he was the perpetrator lacked credibility. Thus, we address Connally's argument regarding credibility of the witnesses in our analysis of the manifest weight of the evidence.

### B. Manifest Weight of the Evidence

{¶ 39} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a ' "thirteenth juror" ' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 40} An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in

which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 41} Connally argues his convictions are against the manifest weight of the evidence because the witnesses' testimony was not credible. First, Connally argues C.F.'s testimony lacked credibility because C.F. testified as part of a plea agreement for his involvement in the same home invasion. However, it was within the province of the jury to believe C.F.'s testimony in spite of his admitted involvement in the home invasion and plea agreement with the state. *See State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18 (noting the jury is in the best position to assess the credibility of a codefendant), citing *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 20. C.F.'s testimony "was not so incredible as to render appellant's convictions against the manifest weight of the evidence." *Berry* at ¶ 18, citing *State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 34.

{¶ 42} Additionally, both D.W. and L.G. corroborated C.F.'s testimony in their own version of events. Though Connally argues that D.W.'s and L.G.'s identifications in the photo array lacked credibility, both witnesses explained that there was some confusion regarding whom they were being asked to identify in each photo array. As we noted above, the jury may take note of inconsistencies and resolve them accordingly. *Raver* at ¶ 21. Moreover, both D.W. and L.G. identified Connally in court, and L.G. testified he was "[p]ositive" Connally was the gunman. (Tr. Vol. II at 190.) *See State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 35 (convictions not against the manifest weight of the evidence where witnesses expressed hesitancy in conducting a photo array identification but provided a positive in-court identification).

{¶ 43} Finally, Connally notes the lack of physical evidence connecting him to the home invasion. However, "[a] lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence." *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12, citing *State v. Shedwick*, 10th Dist. No. 11AP-709, 2012-Ohio-2270, ¶ 32. " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No.

09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence despite the lack of physical evidence).  C.F., L.G., and D.W. all identified Connally as the gunman from the home invasion.  Though Connally denied his involvement to police, he did admit to being in the vicinity of the apartment at the time of the home invasion.  Thus, considering all the evidence, we cannot say the jury lost its way in giving more credibility and weight to the testimony of C.F., L.G., and D.W. than it did to Connally's statements to police.

{¶ 44} Considering all of the evidence together, the jury did not clearly lose its way in concluding Connally was the gunman from the home invasion.  After an independent review of the record, we find sufficient evidence to support Connally's convictions, and Connally's convictions are not against the manifest weight of the evidence.  We overrule Connally's second assignment of error.

## V.  Disposition

{¶ 45} Based on the foregoing reasons, the trial court did not abuse its discretion in admitting into evidence the photographs obtained from Connally's cell phone.  Additionally, the sufficiency and manifest weight of the evidence support Connally's convictions.   Having overruled Connally's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

DORRIAN, P.J., and BRUNNER, J., concur.