[Cite as *State v. Harris*, 2018-Ohio-3872.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                   :

    Plaintiff-Appellee,                    :

                                              No. 17AP-350

v.                                                    :                (C.P.C. No. 15CR-4619)

Tinisee Harris,                              :                (REGULAR CALENDAR)

    Defendant-Appellant.              :

---

## D E C I S I O N

### Rendered on

---

**On brief:** *Michael DeWine*, Attorney General, and *Benjamin W. Karrasch*, and *Kristin Pe*, for appellee. **Argued:** *Benjamin W. Karrasch.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Tinisee Harris, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of tampering with evidence and Medicaid fraud. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} In early 2010, Ethel Freeman-Nnonah, Friday Nnonah, Asad Munye, Hale Harmon, and appellant formed a limited liability company known as Prudent Healthcare Services ("PHS"). PHS was a Medicaid certified home health agency that provided care to homebound Medicaid recipients through a network of home health aides and nurses. PHS used a recruiter to identify potential clients, and, consequently, a significant number of home health aides employed by PHS were family members of the patient. The parties have

stipulated that PHS provided Medicaid reimbursed health care to persons and that PHS was issued a provider number by the Ohio Department of Medicaid.[1]

{¶ 3} The PHS "Public Disclosure Statement" for the year 2010, which was submitted into evidence as State's Ex. 38, lists the following persons as the owners and management of PHS: Friday Nnonah, RN, Administrator; Ethel Freeman-Nnonah, RN, Director of Clinical Services; Munye, Marketing Director; Harmon, Operations Manager; and appellant, Assistant Administrator. The statement further discloses that the Nnonahs and Munye each have a 25 percent interest in the company and that appellant and Harmon each have a 12.5 percent interest.

{¶ 4} Prior to joining PHS, appellant had owned or been associated with other Medicaid certified home health care companies. When appellant joined PHS, he hired Malenda Prak to assist PHS with generating the documentation needed to obtain Medicaid authorization for the provision of health care services and to justify Medicaid reimbursement for those services. Prak had worked for appellant in two of his other home health care companies, and appellant had trained her in the necessary procedures.

{¶ 5} In February 2010, Prak began working for PHS in a position referred to in the testimony as either a medical records clerk or medical records receptionist. Prak does not have a medical background, and her position with PHS did not involve patient care. She testified that one of her primary responsibilities was transferring information charted by a patient's nurse to a Medicaid specific computer software program. On entering the charted information, known either as a start of care assessment ("SOC assessment") or a Medicaid recertification assessment ("recert"), Prak would generate and print a Medicaid compliance form known as a "485" or "plan of care." (Tr. Vol. 7 at 712.) The testimony established that only when the SOC assessment or recert was timely completed and charted and the 485 was timely completed and signed would Medicaid reimbursement be justified.

{¶ 6} The original home office for PHS was located in Columbus, Ohio, but the company eventually opened additional offices in Dayton, Ohio and Cincinnati, Ohio. When PHS opened the Cincinnati office in May 2010, PHS hired registered nurse Tyra Howard to help run the new office. Though Howard was initially hired on a part-time basis, she quickly

---

[1] The trial court took judicial notice of the relevant federal Medicaid regulations in C.F.R. 484.55 and the relevant provisions of Ohio Adm.Code 5101:3-12-03.

realized the patient load for the new office was too much for her to handle. When she told Freeman-Nnonah and appellant that she was falling behind on SOC assessments, she was transitioned to full-time. In order to service a growing caseload, PHS hired another full-time nurse for the Cincinnati office by the name of Regina Reece Jordan in November 2010. According to Howard, Freeman-Nnonah fired Jordan because Jordan was closing cases where, in Jordan's opinion, the patient did not qualify for home-based health care.

{¶ 7} Owing to Howard's continuing complaints about falling behind in SOC assessments, recerts, and 485s, PHS hired two new nurses in May 2011, Marlena Handshoe and Abeba Desalew. Howard testified that appellant subsequently transferred her to the Cincinnati office where she assumed a position either as assistant director of nursing or director of nursing. According to Howard, appellant instructed her to review each patient chart and make a list of required documentation that was either missing or incomplete. Howard found that the patient charts in the Dayton office were "an absolute mess." (Tr. Vol. 6 at 602.) When the prosecutor asked Howard to explain her testimony, the following exchange took place:

> Q. What do you mean by "mess"?
>
> A. There were a lot -- there was a lot of documentation missing out of the charts, so we had some charts that all they had were time sheets in them. We had some charts that had no information from the coordinators, the care-start coordinators. We had some charts that didn't have any assessments. We had charts -- the charts were just a mess.
>
> Q. How often are assessments supposed to be done?
>
> A. You talking about the recerts?
>
> Q. Um-hum.
>
> A. 60 days.
>
> Q. And how often is a plan of care supposed to be done?
>
> A. The 485's?
>
> Q. The 485's.
>
> A. The 485's are to be done within five days of doing research.

Q. Okay. And so were documents missing a lot of tho -- or were the patient files missing a lot of those?

A. Yes.

Q. But how -- so if it's every 60 days, about how many were they missing?

A. Some of them were two, three certs behind.

Q. So that's a hundred twenty days or –

A. Yes.

Q. -- a hundred eighty?

A. Like I said, some of them -- some patients didn't have any documentation in there at all.

(Tr. Vol. 6 at 602-03.)

{¶ 8} Howard testified that appellant instructed her to send him a facsimile containing the list of missing documents and to make an effort to obtain missing documents from their source. Howard acknowledged she was subsequently unable to obtain all the missing documentation.

{¶ 9} On February 23, 2012, investigators from the Ohio Attorney General's office appeared at the Dayton office to serve a subpoena compelling PHS to produce all its patient files. Howard was in the office that day, and she informed the investigators the files were needed by PHS in order to provide necessary health care for PHS patients. According to Howard, the investigators agreed to give PHS time to make copies of the files and informed her they would be back to pick up the files on February 28, 2012. Howard testified that the investigators specifically told her the files were to be copied "as is" without alterations. (Tr. Vol. 6 at 629.)

{¶ 10} Howard immediately called Freeman-Nnonah to inform her of the subpoena and the date when the investigators were scheduled to return. Howard also told Freeman-Nnonah that the subpoena ordered PHS to produce the records in an "as is" condition and that the investigators had informed her they wanted the records "untouched." (Tr. Vol. 6 at 629; State's Ex. 40.)

{¶ 11} Both Prak and Howard testified extensively about the events that occurred in the Dayton office on or about February 23 through February 27, 2012. According to Howard, Freeman-Nnonah, appellant, Prak, and Kathy Kreitzer arrived at the Dayton office on or about February 23 through February 27, 2012. Howard testified about the events that took place that day as follows:

> Q. Okay. So what did you understand the purpose of them coming down was?
>
> A. To correct the files and put the 485's and anything that was missing in the files in the files.
>
> Q. And how did you know that was what the purpose was?
>
> A. Because we were sitting at a table going through the files. There were sticky notes on the files.
>
> [Appellant] would walk over the assessments, give them to Malenda. Malenda would print them out. He would either walk them back to me. I would sign them.
>
> Ethel was pulling stuff out of charts that we didn't have 485's for, making corrections to charts, whatever was missing, supervisory visits, nurses' notes.
>
> There was a list made of whatever was missing in those charts.
>
> Q. So did you tell them at all about how the subpoena said don't change anything?
>
> A. Yes.
>
> Q. Okay. And what was anyone's response?
>
> A. I remember telling [appellant] specifically -- well, we were all in the room, and he said that you guys didn't know what you were talking about because we were allowed to correct paperwork.
>
> Q. Paperwork.
> And when he was saying "you guys," was he talking about you didn't know what you were talking about?
>
> A. No. Somebody at the Attorney General's office didn't know what he was talking about.

(Tr. Vol. 6 at 631-32.)

{¶ 12} Howard also testified that during this process, she personally back-dated her signature on documents in patient charts including SOC assessments and recerts, that she signed 485s relating to patient assessments when she had no personal knowledge whether the patient visit had taken place, and that she signed other 485s even though she knew that the patient visit and subsequent assessment had not been completed at all. In all these instances, PHS had already billed for and received Medicaid reimbursement for the patient services identified in the 485s. Howard testified that appellant would hand her patient charts with "sticky notes" indicating missing or incomplete information and that he asked her to make the necessary corrections. (Tr. Vol. 6 at 701.)

{¶ 13} Howard testified that once a 485 was created and printed by Prak, she signed the document and then sent the document to the attending physician by facsimile seeking the required signature. Howard acknowledged many of the fax cover sheets sent to attending physicians contain "remarks" authored by her such as: "Upon an internal audit of our files, these 485's were found not to have been signed. Please kindly review, sign, and send back to us. Thank you." (Tr. Vol. 6 at 646.) According to Howard, the dated fax cover sheets were not in the patient files when PHS turned them over to the investigators on February 28, 2012 "[b]ecause once the 485's came back signed, we took the fax out of the patient files." (Tr. Vol. 6 at 649.)

{¶ 14} Prak corroborated the essential details of Howard's testimony regarding the events that took place in the Dayton office sometime between February 23 and February 27, 2012. Though she did not hear appellant make the derogatory statement about the investigators attributed to him by Howard, she confirmed appellant's involvement in the coordinated effort to add to or alter documents in patient files in an effort to demonstrate Medicaid compliance. She testified that on the ride home from the Dayton office, she expressed her skepticism to appellant about obtaining signatures from attending physicians on the newly created 485s because they were so untimely. According to Prak, appellant's response was: "He kind of agreed, but he also just, like, you know, 'Just send them out anyway and see. Hopefully we get them signed.' " (Tr. Vol. 7 at 768.)

{¶ 15} On September 18, 2015, a Franklin County Grand Jury indicted appellant for tampering with evidence, in violation of R.C. 2921.12(A)(1) and (2), a felony of the third

degree; theft by deception, in violation of R.C. 2913.02(A)(3), a felony of the fourth degree; and Medicaid fraud, in violation of R.C. 2913.40(D), a felony of the fourth degree. The indictment contained similar charges against Freeman-Nnonah and Prak. Howard was indicted separately on two counts of forgery, a felony of the fifth degree, and two counts of complicity to commit Medicaid fraud, also a felony of the fifth degree.

{¶ 16} Prior to trial, Prak pleaded guilty to complicity to commit Medicaid fraud, a misdemeanor of the first degree. The case proceeded to a joint jury trial of the remaining co-defendants, appellant, and Freeman-Nnonah. The jury found appellant guilty of tampering with evidence and Medicaid fraud but not guilty of the theft offense. The trial court sentenced appellant to two years of basic community control and a $500 fine. The trial court also ordered appellant to make restitution to the Ohio Department of Medicaid in the total amount of $12,029.50.

{¶ 17} Appellant timely appealed to this court from the judgment of conviction and sentence.

## II. ASSIGNMENT OF ERROR

{¶ 18} Appellant asserts a single assignment of error as follows:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF TAMPERING WITH EVIDENCE AND MEDICAID FRAUD AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. STANDARD OF REVIEW

{¶ 19} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact." *Patterson* at ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 20} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 21} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 22} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their

demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV. LEGAL ANALYSIS

{¶ 23} In his sole assignment of error, appellant claims his convictions of tampering with evidence and Medicaid fraud are not based on sufficient evidence and are against the manifest weight of the evidence. We disagree.

{¶ 24} R.C. 2921.12(A) defines the offense of tampering with evidence, in relevant part, as follows:

> No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
>
> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;
>
> (2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation.

{¶ 25} The offense of Medicaid fraud is defined in R.C. 2913.40(D), in relevant part, as follows:

> No person, having submitted a claim for or provided goods or services under the medicaid program, shall do either of the following for a period of at least six years after a reimbursement pursuant to that claim, or a reimbursement for those goods or services, is received under the medicaid program:

(1) Knowingly alter, falsify, destroy, conceal, or remove any records that are necessary to fully disclose the nature of all goods or services for which the claim was submitted, or for which reimbursement was received, by the person;

(2) Knowingly alter, falsify, destroy, conceal, or remove any records that are necessary to disclose fully all income and expenditures upon which rates of reimbursements were based for the person.

{¶ 26} Appellant argues in support of his assignment of error that the testimony of Prak and Howard was not worthy of belief because they each received "generous plea agreements in return for their testimony." (Appellant's Brief at 2.) He also contends that the evidence against him was "largely circumstantial." (Appellant's Brief at 2.)

{¶ 27} "[I]n a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime." *Bankston* at ¶ 4. In making his argument in support of his assignment of error, appellant concedes that the testimony of witnesses Howard and Prak, if believed, is sufficient to sustain appellant's convictions of tampering with evidence and Medicaid fraud beyond a reasonable doubt. We agree. Furthermore, because appellant's sufficiency of the evidence argument is based solely on witness credibility, this court will address the argument in our analysis of the manifest weight of the evidence. *State v. Connally*, 10th Dist. No. 16AP-53, 2016-Ohio-7573, ¶ 37-38 (because Connally does not raise any arguments related to the state's failure to prove any specific element of any of the crimes charged but, instead, argues the evidence the state relied on to prove he was the perpetrator lacked credibility, we address Connally's argument regarding credibility of the witnesses in our analysis of the manifest weight of the evidence).

{¶ 28} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 16, citing *Cattledge* at ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, ' "is best able to view the witnesss and observe their demeanor, gestures and voice inflections, and use these

observations in weighing the credibility of the proffered testimony." ' "   *Berry* at ¶ 16, quoting *Cattledge* at ¶ 6, quoting *Seasons Coal Co.* at 80.

{¶ 29} In *Connally*, appellant argued that his convictions of aggravated burglary, aggravated robbery, robbery, and kidnapping were against the manifest weight of the evidence.  His convictions were based in large part on the testimony of a witness who admitted involvement in one of the robberies and had pleaded guilty to a lesser offense in return for his testimony against appellant.   In rejecting appellant's manifest weight argument, this court set forth the relevant law as follows:

> [I]t was within the province of the jury to believe [the co-conspirator's] testimony in spite of his admitted involvement in the home invasion and plea agreement with the state.  *See State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18 (noting the jury is in the best position to assess the credibility of a codefendant), citing *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 20. [The co-conspirator's] testimony "was not so incredible as to render appellant's convictions against the manifest weight of the evidence." *Berry* at ¶ 18, citing *State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 34.

*Connally* at ¶ 41.

{¶ 30} Here, Howard was indicted on two counts of forgery, a fifth-degree felony, and two counts of complicity to commit Medicaid fraud, also a fifth-degree felony.  She eventually pleaded guilty to the lesser-included offense of attempted complicity to commit Medicaid fraud, a misdemeanor of the first degree.  She was found guilty of that charge and sentenced to two years of probation and ordered to pay restitution of $14,275.44.  As a further result of her conviction, Howard's nursing license was suspended for five years and she was placed on the "Medicare/Medicaid list" for seven years, which means that she is prohibited from working in any occupation involving Medicare or Medicaid.  (Tr. Vol. 6 at 627.)

{¶ 31} Prak was indicted on charges of tampering with evidence, complicity to commit theft by deception, and complicity to commit Medicaid fraud.  Prak pleaded guilty to the charge of complicity to commit Medicaid fraud, a misdemeanor of the first degree, and she was placed on probation for two years.  The trial court ordered Prak to pay restitution of $12,000.

{¶ 32} On this record, appellant's characterization of the plea agreements reached by Howard and Prak as "generous" is an overstatement. (Appellant's Brief at 2.) Even though both witnesses avoided conviction on felony charges by entering a plea, both witnesses have a sizeable restitution order to satisfy, and their employment in their chosen profession or vocation has been seriously limited by the convictions. Howard testified her conviction has negatively impacted her life. Howard's nursing license was suspended, and she understood there were no guarantees her nursing license would be reinstated after the five-year suspension ended. Prak testified that she lost her job as an intake specialist with Ohio Health as a result of her conviction and that she now works as a nail technician, where her income is "just up and down. Some days you make money. Some days you don't." (Tr. Vol. 7 at 771.)

{¶ 33} Even if we were to agree that the plea agreements were generous, it was within the province of the jury to believe Howard's and Prak's testimony in spite of their admitted involvement in the welfare fraud and evidence tampering that took place in this case. *Connally* at ¶ 41, citing *Berry* at ¶ 18 (even though the state's primary witness against appellant admitted involvement in the murders, his willingness to testify against appellant and his other co-conspirators, his receipt of a reduced prison sentence, and his attempt to minimize his role in these murders, the witness was not so incredible as to render appellant's convictions against the manifest weight of the evidence). The jury was made aware of the charges against Howard and Prak, the plea agreements they reached with the prosecutor in return for their testimony, the charges they were convicted of, and the sentence they each received as a result of their conduct in this case. Both witnesses were cross-examined by counsel for appellant as well as counsel for appellant's co-defendant, Freeman-Nnonah, regarding their plea deals. The trial court instructed the jury, in relevant part, as follows:

> You've heard testimony from Malenda Prak, Tyra Howard, * * * who have been accused of the same crimes charged in this case and are said to be accomplices. Whether Malenda Prak, Tyra Howard * * * were accomplices and the weight to give their testimony are matters for you to determine from all of the facts and circumstances in evidence.
>
> An accomplice is one who purposely or knowingly assists or join another in the commission of a crime. The testimony of an

> accomplice does not become inadmissible because of the complicity, moral turpitude, or self-indifference but the admitted or claimed complicity of anoth -- of a witness may affect her credibility and make her testimony subject to grave suspicion and requires that it be weighed with great caution. It is for you, the jurors, in the light of all the facts presented to you and heard from the witness stand, to evaluate such testimony and to determine its quality and worth or lack of quality and worth.

(Tr. Vol. 9 at 1202-03.)

{¶ 34} There is no contention by appellant that the instruction given by the trial court misstates the law, and it is axiomatic that "[a] jury may be presumed to follow the instructions of the court." *State v. Carson*, 10th Dist. No. 05AP-13, 2006-Ohio-2440, ¶ 60, citing *State v. Henderson*, 10th Dist. No. 04AP-1212, 2005-Ohio-4970, ¶ 19. Accordingly, on this record, we find no support for appellant's contention that the testimony of Prak and Howard was so unworthy of belief that the jury lost its way by considering it and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. Furthermore, because we disagree with appellant's assertion that the jury was required to disregard all of Prak's and Howard's testimony, we need not address appellant's supposition that the remaining evidence was insufficient to sustain appellant's convictions beyond a reasonable doubt. *Connally* at ¶ 38.

{¶ 35} For the foregoing reasons, we hold that appellant's convictions of tampering with evidence and Medicaid fraud are supported by sufficient evidence and not against the manifest weight of the evidence. Accordingly, we overrule appellant's sole assignment of error.

## V. CONCLUSION

{¶ 36} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

KLATT and HORTON, JJ., concur.

———————————