[Cite as *State v. Jenkins*, 2018-Ohio-4988.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-324 |
| v. | : | (C.P.C. No. 17CR-3217) |
| Chauncey M. Jenkins, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 13, 2018

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Chauncey M. Jenkins, appeals the judgment of the Franklin County Court of Common Pleas finding appellant guilty of felonious assault. For the following reasons, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On June 13, 2017, a grand jury indicted appellant on one count of felonious assault, pursuant to R.C. 2903.11, a second-degree felony, and one count of kidnapping, pursuant to R.C. 2905.01, a first-degree felony, arising from an altercation with Moniqua Wallace on June 3, 2017. Appellant, represented by counsel, entered a plea of not guilty, and the case proceeded to a two-day trial by jury commencing March 19, 2018. Plaintiff-appellee, State of Ohio, called Wallace as its first witness.

{¶ 3}   Wallace testified that she works as a recruiter and met appellant at a job fair. After a casual friendship for about one and one-half months, the two began a romantic relationship.   Wallace was engaged to another man at the time and wore a diamond engagement ring.   For a couple of months, everything was "fine" in Wallace's relationship with appellant, although appellant had "insecure issues" about people texting and calling her.  (Tr. Vol. 1 at 59.)

{¶ 4}   Approximately two and one-half months into their relationship, on June 2, 2017, appellant and Wallace went to a bar together close to midnight, taking Wallace's car. At the bar, she talked with a man she had formerly recruited and then ran into some friends and introduced appellant as a friend.   According to Wallace, this upset appellant.   They stayed at the bar until it closed.   During this time, Wallace had one-half of a drink, and appellant had approximately two and one-half drinks.

{¶ 5}   On leaving the bar, Wallace got in the driver's seat of her car, and appellant got in the passenger seat.   Appellant wanted to go bowling, while Wallace wanted to return home.   According to Wallace, she could tell that appellant was still upset.   Wallace testified that as she was driving, appellant began to grab and "yank[]" the steering wheel while yelling and cursing at Wallace about playing games with his feelings.   (Tr. Vol. 1 at 77.) Wallace began crying and attempted to turn into a gas station to get away or make it to her cousin's house, but appellant turned her steering wheel again.

{¶ 6}   According to Wallace, appellant then yanked her hair down and told her to turn into a parking lot area.   Appellant exited the car, still holding her hair, and pulled Wallace out of the car.   Wallace testified that at this point, she believed appellant was going to kill her and that she was fending for her life.   She pleaded with him to take the car and let her go.   At this point, according to Wallace, appellant sought her cell phone in order to go through her messages.   Wallace told appellant she had thrown her phone out of the window, but appellant did not believe her and began calling her phone repeatedly as he looked for it, still keeping a hold of Wallace's hair in the process.   Wallace believed this was occurring around 3:00 a.m. to 5:00 a.m in the morning hours of June 3, 2017, but was unsure of the exact time.

{¶ 7}   After being unable to find the cell phone, which Wallace testified was in a compartment near the driver's seat, appellant ended up putting her in the passenger side

of the vehicle and tying her braids to the back of the headrest. Wallace testified appellant then drove her car while continuing to call her cell phone and eventually located it in the car. Appellant stopped the car in an alley off Main Street and parked behind a garage. According to Wallace, appellant demanded that she put her passcode into her phone, bent her finger back, and told her he would break all her fingers if she did not comply. Once Wallace provided the code, appellant read through the text messages Wallace sent to her fiancé that discussed her loving the fiancé and wanting to still be together with him. Wallace testified that during this time, appellant "went crazy" and started beating Wallace in the head, face, and stomach, bending back her fingers, and pulling and turning her neck as if "he [were] trying to break [her] neck," which caused her to not be able to breathe and led her to black out at one point. (Tr. Vol. 1 at 91, 92.)

{¶ 8} Wallace, fearing for her life, decided to fight back. She hit him and kicked the car. When another car pulled out of a garage, appellant finally stopped hitting her and pulled the car away. According to Wallace, appellant's demeanor calmed down, and he commented that Wallace was at fault, and they needed to find a place to clean her up. Appellant got a room at a hotel. Once there, Wallace told appellant she needed to go to the hospital, and, if he took her, she promised to tell the hospital personnel that she "got jumped," and appellant picked her up. (Tr. Vol. 1 at 100.) According to Wallace, appellant talked about killing himself, the two prayed together, and Wallace told appellant that she forgave him, which Wallace testified was not true but an attempt to get appellant to take her to the hospital. Ultimately, appellant agreed to take her to the hospital.

{¶ 9} Appellant and Wallace both entered the emergency department of the hospital. Wallace testified that she told the front registration personnel that she had been jumped, but once she was taken back to the triage area without appellant, she told the nurse that appellant gave her the injuries. Eventually, police arrived and took appellant to jail.

{¶ 10} Wallace testified when she was released from the hospital, she felt depressed, confused, and in disbelief that someone that claimed to love her beat her so badly and that she "wanted answers." (Tr. Vol. 1 at 129.) At that time, she still loved and cared about him. Wallace testified she visited appellant while he was in custody, sent him cards, "put money on his books," and talked with him on the phone. (Tr. Vol. 1 at 168.) At some point, Wallace stopped contacting appellant. (Tr. Vol. 1 at 168.)

{¶ 11} On cross-examination, Wallace testified she had told appellant and his mother that she was pregnant in May 2017 and then told him she was not pregnant. The defense attorney introduced appellant's cell phone record, which showed seven phone calls between 2:30 a.m. and 4:10 a.m. on June 3, 2014. Wallace also agreed that she did not tell the detective who interviewed her in the emergency room specifically about appellant calling her phone in an attempt to locate it and agreed she discussed the calls after the prosecutor asked about the calls. On redirect examination, Wallace testified that when she told appellant about her pregnancy prior to the altercation in May, she was in fact pregnant but then had an abortion and did not tell him she was no longer pregnant. Wallace also testified she told appellant she was pregnant again during the night of the incident in an attempt to get appellant to stop hitting her.

{¶ 12} Officer Brian K. Reid of the Columbus Division of Police testified to responding to the emergency room where Wallace was being treated. According to Reid, Wallace informed him that she had driven to a bar with her boyfriend using her car and appellant left his car at her house, they got into an altercation when they left the bar, he assaulted her while they were in the car, and they ended up at a hotel for some time before she talked him into taking her to the hospital. Reid went to where appellant was waiting, detained him without incident, and other officers escorted him to a police cruiser. Detective Yvonne Taliaferro testified to taking photographs of Wallace in the emergency room and of her car. The photographs were admitted into evidence.

{¶ 13} Julie Pultinas, M.D., an emergency room physician, testified she treated Wallace on the morning of June 3, 2017. According to Dr. Pultinas, Wallace wanted appellant to be removed from her room prior to discussing what occurred and was worried about appellant having her car keys. Once appellant left the room, Wallace appeared "emotionally upset, began crying immediately" and told Dr. Pultinas that appellant had become physically violent, was pulling her braids out and trying to hit her while driving, and described being punched and kicked in the face and stomach. (Tr. Vol. 1 at 235.) Regarding Wallace's injuries, Dr. Pultinas described swelling and bruising around her mid-face and eyes and "subconjunctival hemorrhage" in the white part of her right eye. (Tr. Vol. 1 at 220.) Dr. Pultinas also noted hair missing off the front part of Wallace's scalp. Wallace reported pain in her right hand, wrist, and knuckles. Dr. Pultinas, suspicious of fractures

in the face and wrist, ordered a CT scan and x-ray for Wallace. The CT scan revealed fractures of the nasal bones and the bone that attached the nose to the upper lip.

{¶ 14} Michael Hopewell, Wallace's adult son, testified that after not being able to reach his mother by cell phone on the morning of June 3, 2017, he eventually learned she was in the hospital. According to Hopewell, he went to see her, and she told him appellant had assaulted her. Hopewell testified he never had any problems with appellant prior to the assault, said he helped his mother around the house, and had considered him a "cool dude, real calm." (Tr. Vol. 2 at 281.)

{¶ 15} Appellee rested its case, and the defense moved for a Crim.R. 29 motion for acquittal based on insufficient evidence. The trial court denied the motion, and the defense rested its case. The jury returned a verdict of guilty as to the felonious assault charge and not guilty as to the kidnapping charge. The trial court held a sentencing hearing on April 4, 2018 and imposed a sentence of six years in prison and up to three years mandatory post-release control. The trial court filed the judgment entry in the case on April 5, 2018.

{¶ 16} Appellant filed a timely appeal.

## II.  ASSIGNMENT OF ERROR

{¶ 17} Appellant assigns the following as trial court error:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF FELONIOUS ASSAULT AS THAT VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III.  STANDARD OF REVIEW

{¶ 18} "Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 15, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime

proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "A verdict will not be disturbed unless, after viewing the evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact." *State v. Patterson*, 10th Dist. No. 15AP-1117, 2016-Ohio-7130, ¶ 32, citing *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 19} "In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction." *Kurtz* at ¶ 16, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). "Further, 'the testimony of one witness, if believed by the jury, is enough to support a conviction.' " *Patterson* at ¶ 33, quoting *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *See also State v. Clark*, 10th Dist. No. 15AP-926, 2016-Ohio-5493, ¶ 25.

{¶ 20} "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence." *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins* at 387. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 21} "When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Patterson* at ¶ 34, citing *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a

conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

{¶ 22} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility*." State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *discretionary appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

## IV.  LEGAL ANALYSIS

### A.  Appellant's Assignment of Error

{¶ 23} In his assignment of error, appellant contends the jury's guilty verdict on the felonious assault charge was not supported by sufficient evidence and was against the weight of the evidence. We disagree.

{¶ 24} Felonious assault, as defined, in pertinent part, by R.C. 2903.11(A)(1), states "[n]o person shall knowingly * * * [c]ause serious physical harm to another." Appellant's sole argument in support of his assignment of error is that Wallace's testimony should not have been found credible by the jury or the trial court. Appellant contends Wallace's testimony lacked credibility because:

> Her romantic duplicity aside, she also appeared to be quite manipulative and easily able to weave whatever story suited her purpose at that moment. For example, she lied to [appellant] about being pregnant to make him stop assaulting her. However, Wallace had used that same ruse on [appellant] and his family approximately a month before the instant case. (T. 146-148). She also failed to mention, until confronted on cross examination, that her cell phone received several phone calls from [appellant's] phone between 2:30 a.m. and 4:10 a.m. on

June 3d. (T. 165-167). That was even though Wallace claimed that [appellant] was assaulting her and driving her around during that time. (T. 82-112). She also visited him in the county jail after his arrest; sent him cards and letters while in jail; and even put funds on his inmate account. (T. 129-131).

(Appellant's Brief at 2-3.)

{¶ 25} As a preliminary matter, "because appellant's sufficiency of the evidence argument is based solely on witness credibility, this court will address the argument in our analysis of the manifest weight of the evidence." *State v. Harris*, 10th Dist. No. 17AP-350, 2018-Ohio-3872, ¶ 27, citing *State v. Connally*, 10th Dist. No. 16AP-53, 2016-Ohio-7573, ¶ 37-38. *See also State v. Saxton*, 10th Dist. No. 15AP-16, 2016-Ohio-1233, ¶ 15.

{¶ 26} On our own review of the record, we disagree that the matters raised by appellant renders this an " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175. First, regarding appellant's reference to Wallace's "romantic duplicity," appellant provides, and we find, no legal authority demonstrating the fact a witness dated two people at the same time undermined that witness's credibility, let alone demanded reversal based on the manifest weight of the evidence. (Appellant's Brief at 2.)

{¶ 27} Second, appellant's contention that one month prior to the assault, Wallace lied to appellant and his family about being pregnant is countered by Wallace's testimony that she was in fact pregnant in May when she told appellant and his mother about the pregnancy. While Wallace admitted to lying to appellant about being pregnant while he was attacking her, she explained she did so in an attempt to get appellant to stop physically assaulting her. The jury heard her admit to lying to appellant and her reasoning for doing so. The jury's decision to believe Wallace's testimony regarding the assault despite her acknowledgement of lying about being pregnant during the assault does not show the jury clearly lost its way in this case.

{¶ 28} Third, appellant provides, and again we find, no legal authority demonstrating the fact a victim-witness continues to have contact with the defendant while he is in jail, when she is or was romantically involved with that defendant, undermined that witness's credibility or demanded reversal based on the manifest weight of the evidence. To the contrary, in considering a similar argument within a manifest weight of the evidence

challenge on appeal, this court upheld a jury's determination of credibility regarding a victim-witness who continued to have contact with the defendant with whom she had been in a romantic relationship. *State v. Marrero*, 10th Dist. No. 10AP-344, 2011-Ohio-1390, ¶ 17-18.

{¶ 29} Overall, the jury was in the best position to observe Wallace and weigh the credibility of her proffered testimony. *Cattledge*. We note Reid and Dr. Pultinas' testimony showed Wallace expressed, shortly after the incident while still in the emergency room, a version of events largely consistent with her testimony at trial. Dr. Pultinas' testimony and photographic evidence of Wallace's injuries are likewise consistent with Wallace's account. While appellant may disagree with the jury regarding Wallace's credibility, this is not an adequate reason to reverse a judgment on manifest weight grounds. *Harris*, 2014-Ohio-2501, at ¶ 25; *G.G.* at ¶ 7; *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43 ("[A] conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.").

{¶ 30} After our review of the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find the trier of fact did not clearly lose its way and did not create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins*. For the foregoing reasons, we hold appellant's conviction of felonious assault is not against the manifest weight of the evidence and is supported by sufficient evidence. *Harris*, 2018-Ohio-3872, at ¶ 35; *Patterson* at ¶ 33.

{¶ 31} Accordingly, we overrule appellant's assignment of error.

## V. CONCLUSION

{¶ 32} Having overruled appellant's sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

TYACK and LUPER SCHUSTER, JJ., concur.

_____