[Cite as *State v. Brightwell*, 2019-Ohio-1009.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio | : | |
| Plaintiff-Appellee, | : | |
| | | No. 18AP-243 |
| v. | : | (C.P.C. No. 16CR-7278) |
| Janei M. Brightwell, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on March 21, 2019

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Michael P. Walton*, for appellee. **Argued:** *Michael P. Walton*.

**On brief:** *Bellinger & Donahue*, and *Kerry M. Donahue*, for appellant. **Argued:** *Kerry M. Donahue*.

APPEAL from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, Janei M. Brightwell, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of aggravated robbery, aggravated murder, and attempted murder. For the reasons that follow, we affirm.

I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On December 17, 2016, Tremaine Manns received a telephone call from his cousin, Shai-kee Allen, the victim. Allen needed a ride from his home on Alum Creek Drive in Columbus to an auto shop on Hamilton Road and then to a duplex on Napoleon Avenue where Allen used to live. The time was approximately 2:00 or 3:00 p.m. when they arrived at the Napoleon Avenue address. According to Manns, a man came out of the duplex and began conversing with Allen about purchasing marijuana. At trial, Manns identified

appellant as the man he saw that day. After two or three minutes, Manns took Allen back to his home on Alum Creek Drive.

{¶ 3} A few hours later, Allen called Manns seeking a ride to a residence on 6th Avenue in Columbus, Ohio. Manns denied any prior knowledge that Allen wanted a ride to the 6th Avenue address in order to sell marijuana. When Manns and Allen arrived at the address, Allen sat in the passenger seat while sending a text message to the female resident's cell phone. Manns observed that Allen had in his possession four plastic baggies containing different amounts of marijuana. Manns remained seated in the driver's seat using his cell phone.

{¶ 4} Manns testified that after waiting a short time, a man, later identified as Ciree Matthews, approached the passenger side of the vehicle and began discussing the marijuana purchase with Allen. Manns had never seen this man before, and he continued using his cell phone while Allen spoke to the man. Allen showed the man the marijuana and let the man smell it. On cross-examination, Manns denied Allen had a handgun on his lap while he was speaking with the man about the marijuana. Manns stated that the man did not buy any marijuana from Allen. According to Manns, the following events then occurred:

> Q. And you referred to him as "the dude" that came up. As he's talking to him about the weed and they're talking about the pricing, does anybody else come up?
>
> A. Yes.
>
> Q. Okay. Tell us about that. What happened?
>
> A. I'm on my phone, scrolling. The door opened up, so I look over.
>
> Q. Which door opens up?
>
> A. [Allen's] door.
>
> Q. Okay.
>
> A. [Allen's] door opened up, so I look over. The dude that [Allen] is talking to, he had a gun pointed towards us. Then the person that came around back opened up the door. They said, we need everything, or something like that. And I heard a gun -- I heard a gun cock back, so I started the car and pulled off.
>
> Q. Do you know where this second person came from?

A. From like the back end of the car.

Q. Back end of the car. And is that the person that opened [Allen's] door?

A. Yes.

Q. And is that what caught your attention to look over when the door opened?

A. Yes.

Q. How far open did the door open?

A. Wide open.

* * *

Q. And you said the first person that he's talking to, is that person still there?

A. Yes.

Q. And where is that person?

A. Same spot where he's talking to him on the sidewalk.

Q. On the sidewalk?

A. Yes.

Q. And the second person is the one that's closer to the car?

A. Yes.

Q. Could you see the second person's face?

A. No.

(Tr. Vol. II at 127-30.)

{¶ 5} On appeal, plaintiff-appellee, State of Ohio, has argued the above-cited testimony from Manns establishes that "a second person opened the passenger door, and had a gun pointed at Allen and Manns." (Appellee's Brief at 2.) Manns' testimony on cross-examination, however, casts doubt on appellee's interpretation. On cross-examination, Mann testified as follows:

Q. Now, there was some discussion about photo arrays. You were shown a photo array in which there was a photo of [appellant]?

A. Yes.

Q. You know [appellant], so there was no reason to not be able to pick his picture out?

A. No.

> Q. Did you know the individual that was standing at the car with the gun --
>
> A. No.
>
> Q. -- negotiating the price?
>
> A. No.

(Tr. Vol. II at 154.)

{¶ 6} Though Manns never got a look at the face of the second man, he did see that he was wearing a black fleece jacket, "like a windbreaker" with "[b]lue-pinkish, something like that." (Tr. Vol. II at 130.) Manns testified after the second man opened the passenger side door and shouted "[w]e need everything," Manns heard a gun cock. (Tr. Vol. II at 128.) Manns immediately put the car in drive and pulled away. As he was pulling away, Manns heard four shots. Manns testified that Allen managed to get the car door shut but he saw blood coming out of Allen's left hand. Allen told Manns he had been shot, and Manns took Allen to the nearest hospital.

{¶ 7} When Manns got to the hospital, he told emergency room personnel that his cousin had been shot, and they brought Allen into the emergency room. Manns was later taken by police from the hospital to police headquarters where he learned that Allen had passed away. At trial, Manns stated on the night of the shooting, he had a .38-caliber revolver in his back pack in the back seat of the car, but the weapon was missing the next day. That firearm has never been recovered.

{¶ 8} Manns went back to police headquarters for an interview on December 19, 2016, where he picked a photograph of Matthews out of a photo array and identified him as the person who first approached the vehicle to speak with Allen on the evening of the shooting. (State's Ex. K-1.) From another photo array, Manns identified appellant as the man he had seen earlier on that same day at the Napoleon Avenue address, but he could not identify him as the second man who approached the vehicle from the rear because he did not see that man's face. (State's Ex. K-2.) Manns did make an in-court identification of appellant as the man he saw at the Napoleon Avenue address on the day of the shooting.

{¶ 9} On December 17, 2016, Matthews was living in a two-story home on 6th Avenue with his child, his child's mother, Kiara Prowell, and Kiara's sister, Aaliyan Holmes. Matthews testified Holmes' best friend, Marlissa McGhee, was a guest in their home on December 17, 2016. Matthews stated on the afternoon of December 17, 2016, he got a ride

from McGhee to an address on Napoleon Avenue in Columbus for the purpose of buying marijuana. While Matthews was at the Napoleon Avenue address, he met appellant who he had known since middle school. Matthews asked appellant to accompany him back to his home on 6th Avenue.

{¶ 10} When Matthews, McGhee, and appellant arrived at Matthews' home on 6th Avenue, everyone but Holmes began drinking alcohol and smoking marijuana. According to Matthews, he observed that appellant had a handgun in his possession. Matthews, who was familiar with firearms, described the weapon as a "Glock * * * [s]emi-automatic." (Tr. Vol. III at 80.) Matthews testified when the marijuana ran out, appellant used McGhee's phone to contact someone whom he knew would sell them more marijuana.

{¶ 11} According to Matthews, no more than one hour later, they received a message on McGhee's phone that the seller was waiting outside. Matthews went out the front door and onto the porch where he saw a car at the curb with its break lights on and two men sitting in it. When Matthews made a hand gesture toward the vehicle indicating he was looking for marijuana, the passenger gave a positive response and rolled down his window. Matthews described both the passenger and driver of the vehicle as black males whom he had never seen before.

{¶ 12} Matthews went to the passenger's window and saw the passenger get a baggie of marijuana from the console. The man let Matthews see, smell, and handle the marijuana and told Matthews he was asking $50 for an eighth of an ounce. As he spoke with the seller, Matthews noticed the seller had a revolver sitting on his lap and that the driver was busy doing something on a cell phone. Matthews testified he was not frightened by the gun and continued to negotiate with the seller. Matthews concluded the marijuana was not the quality he was interested in and gave it back to the passenger. At that point in time, Matthews noticed appellant had come out of the house wearing a black and blue sweater, black pants, and black shoes.

{¶ 13} When appellant came up behind him approaching the passenger window, Matthews backed away and started heading for the house. He heard appellant exclaim "[w]hat's up" and then he heard raised voices. (Tr. Vol. III at 77.) Matthews saw appellant pull the handgun from his waistband and shoot into the vehicle. Matthews heard four or

five shots in rapid succession before the vehicle sped off. According to Matthews, appellant ran past him at the doorway and headed upstairs.

{¶ 14} When Matthews asked appellant what happened, appellant said "[h]e wouldn't give it up." (Tr. Vol. III at 81.) Matthews stated appellant was holding the Glock in one hand, and in the other hand, he was holding the .38 revolver that had been sitting on Allen's lap. Appellant then offered Matthews a handgun stating "[y]ou ain't lacking no more," but Matthews refused to take it. (Tr. Vol. III at 82.) Appellant, Matthews, and the three women who were still in the house with the baby, shut the lights out, locked the doors, closed the blinds, and stayed inside as police arrived at the scene and investigated. The next day, Matthews left the house on foot and Prowell dropped Matthews off down the street from her mom's house, where he just walked away. Matthews testified he was arrested on December 27, 2016.

{¶ 15} Matthews admitted at trial that he had a 2015 conviction for providing false information to police. He also testified that as a result of the incident, which resulted in Allen's death, he pleaded guilty to obstructing justice pursuant to a plea agreement with the prosecutor in return for his promise to testify truthfully at appellant's trial. Matthews was aware he could be sentenced to a three-year prison term for his conviction but that he had not yet been sentenced. Matthews was currently in jail for that offense pending sentencing, and he had been in jail for a total of 14 months at the time of trial.

{¶ 16} Deputy Corner Dr. Kenneth Gerston of the Franklin County Coroner's Office testified Allen died from a single gunshot wound which perforated the root of the aorta. Gerston stated that the bullet entered Allen's left hand just under the thumb, passed through the back of his hand and entered his right upper chest cavity before fragmenting into two parts after striking a rib. Dr. Gerston found the bullet core in the right chest cavity and the bullet jacket in the pericardial sac. There was no exit wound. The lack of soot and stippling around the thumb indicated the fatal shot was fired from an indeterminate distance of more than 12 to 18 inches. According to Dr. Gerston, the wounds on Allen's body were consistent with the victim being seated in the front passenger compartment of a vehicle with the assailant standing outside the passenger compartment and shooting into the vehicle.

{¶ 17} McGhee corroborated Matthews' story about meeting appellant at the Napoleon Avenue address and driving appellant and Matthews back to the 6th Avenue location, and she agreed with Matthews' assertion that appellant used her phone to contact Allen. McGhee also observed appellant carrying a handgun when he arrived at the 6th Avenue address. She described the handgun as "like bulky, black." (Tr. Vol. III at 44.) McGhee stated both appellant and Matthews left the home through the back door and that several minutes later "we heard gunshots, like three of them." (Tr. Vol. III at 23.) Less than one minute later, she saw Matthews and appellant run back in the house together through the back door. McGhee testified she believed she heard appellant ask Matthews: "Did you get the gun?" (Tr. Vol. III at 24.) According to McGhee, though appellant and Matthews denied wrongdoing, no one left the home that evening.

{¶ 18} The morning after the shooting, McGhee, Holmes, and Prowell went to Holmes' mother's house. Holmes' mother called police and when detectives arrived, McGhee told them about the events of the previous evening. McGhee also made a photographic identification of appellant and Matthews.

{¶ 19} On December 30, 2016, a Franklin County Grand Jury indicted both appellant and Matthews on charges of aggravated robbery, in violation of R.C 2911.01, a felony of the first degree; aggravated murder, in violation of R.C. 2903.01, an unclassified felony; murder, in violation of R.C. 2903.02, an unclassified felony; murder, in violation of R.C. 2903.02, an unclassified felony; attempted murder, in violation of R.C. 2923.02 and 2903.02, a felony of the first degree; and felonious assault, in violation of R.C. 2903.11, a felony of the second degree. Each of the counts in the indictment was accompanied by a three-year firearm specification.

{¶ 20} On April 27, 2017, Roger Moore was walking his dog in Walnut Hill Park on the east side of Columbus when he discovered a discarded and loaded black handgun. Moore called 911 and police arrived to retrieve the weapon, a black Glock semi-automatic. The recovered Glock was admitted into evidence as State's Exhibit Q. Columbus Division of Police firearm's expert Kelby Ducat subsequently tested the firearm and determined the firearm was operable, and the five shell casings recovered from the crime scene were fired from that 9 mm Glock. However, because the bullet fragments found in Allen's body were so badly damaged, Ducat was unable to match the fragment to that particular Glock.

{¶ 21} A Franklin County jury found appellant guilty of all counts. The trial court subsequently ruled the two counts in the indictment charging appellant with murder merged with the count charging appellant with aggravated murder, and the count in the indictment charging appellant with felonious assault merged with the count in the indictment charging appellant with attempted murder. Accordingly, in the trial court's April 5, 2018 judgment entry, the trial court convicted appellant of aggravated robbery with a 3-year firearm specification, aggravated murder with a 3-year firearm specification, and attempted murder with a 3-year firearm specification. The trial court sentenced appellant to 4 years' imprisonment for aggravated robbery, plus 3 years for the firearm specification, 25 years to life for aggravated murder, plus 3 years for the firearm specification, and 3 years' imprisonment for attempted murder, plus 3 years for the firearm specification. The trial court imposed consecutive sentences for aggravated murder and attempted murder and ordered appellant to serve those terms concurrent to the term of imprisonment for aggravated robbery. The trial court also ordered appellant to serve the 3-year terms of imprisonment for the firearm specifications consecutive to one another and consecutive to each of the other prison terms, for an aggregate prison sentence of 34 years to life.

{¶ 22} Appellant timely appealed to this court from the judgment of conviction and sentence.

## II. ASSIGNMENTS OF ERROR

{¶ 23} Appellant assigns the following as trial court error:

> [1.]   THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

> [2.] IT WAS PLAIN ERROR FOR THE COURT TO FAIL TO INSTRUCT THE JURY ON UNCORROBORATED TESTIMONY OF A CO-CONSPIRATOR (SUBSTANTIAL EVIDENCE ANALYSIS).

## III. LEGAL ANALYSIS

### A. Appellant's Second Assignment of Error

{¶ 24} Because our resolution of appellant's second assignment of error impacts our analysis of appellant's first assignment of error, we will begin our discussion with appellant's second assignment of error. In appellant's second assignment of error,

appellant contends the trial court committed plain error when it instructed the jury as to the weight and credibility afforded to the testimony of an accomplice. We disagree.

{¶ 25} R.C. 2923.03(A)(2) provides, in relevant part, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." R.C. 2923.03(F) provides "[w]hoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."

{¶ 26} Under R.C. 2923.03(D), the following cautionary instruction is to be given to the jury if an alleged accomplice testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense:

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

{¶ 27} The trial court instructed the jury regarding the weight and credibility afforded the testimony of an accomplice as follows:

> The testimony of an accomplice does not become inadmissible because of his complicity in wrongdoing or self-interest. However, admitted or claimed complicity or self-interest of a witness may affect their credibility; that is, make testimony subject to grave suspicion, and require that it be weighed with grave caution.

(Tr. Vol. IV at 35-36.)

{¶ 28} Appellant acknowledges he did not object to the instruction given by the trial court, and, accordingly, he has waived all but plain error with respect to the instruction. In *State v. Wilcox*, 10th Dist. No. 15AP-957, 2016-Ohio-7865, this court summarized the plain error standard as follows:

> An alleged error is plain error only if the error is obvious, and but for the error, the outcome of the trial clearly would have been otherwise. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. Plain error should be noticed only with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.

(Internal quotations and citations omitted.) *Id.* at ¶ 47.

{¶ 29} Appellant argues the trial court should have instructed the jury in accordance with former R.C. 2923.03(D) that "[n]o person may be convicted of complicity under this section solely upon the testimony of an accomplice, unsupported by other evidence." As appellee points out, however, R.C. 2923.03 was amended in 1986, and the current version of the statute does not require an instruction containing the language cited by appellant. *See State v. Wickline*, 10th Dist. No. 87AP-46 (Dec. 20, 1988), fn. 1 ("R.C. 2923.03(D) was amended in 1986 and corroboration is no longer required by statute.").

{¶ 30} In *State v. Ferguson*, 10th Dist. No. 12AP-1003, 2013-Ohio-4798, this court stated: "We have previously considered R.C. 2923.03(D) and observed that ' "R.C. 2923.03(D) explicitly permits substantial compliance with the accomplice testimony instruction." ' " *Id.* at ¶ 42, quoting *State v. Sutton*, 10th Dist. No. 06AP-708, 2007-Ohio-3792, ¶ 61, quoting *State v. Fitzgerald*, 11th Dist. No. 2003-L-084, 2004-Ohio-6173, ¶ 31. This court has also held that "a trial court substantially complies with R.C. 2923.03(D) by alerting the jury that accomplice testimony should be viewed with 'grave suspicion' and 'weighed with great caution.' " *Sutton* at ¶ 61, quoting *Fitzgerald* at ¶ 35. This court "described as 'key phrases' in the instruction that the jury should view accomplice testimony with 'grave suspicion' *and* weigh that testimony 'with great caution.' " (Emphasis sic.) *Ferguson* at ¶ 42, quoting *Sutton* at ¶ 62.

{¶ 31} Though the instruction given by the trial court in this instance is not a verbatim recitation of the statutory language, we find the instruction substantially complies with the statutory requirement. The instruction given requires the jury to assess the credibility of an accomplice with "grave suspicion" and to weigh such testimony "with great caution." (Tr. Vol. IV at 36.) Thus, the key phrases in the statutory instruction are present in the instruction given by the trial court in this case. Furthermore, the language appellant claims the trial court should have included in the instruction is no longer required by the

statute. *Wickline.* Accordingly, we hold the trial court did not commit error when it instructed the jury regarding the testimony of an accomplice, let alone plain error. Appellant's second assignment of error is overruled.

### B. Appellant's First Assignment of Error

{¶ 32} In appellant's first assignment of error, appellant argues that his convictions of aggravated robbery, aggravated murder, and attempted murder are against the manifest weight of the evidence. We disagree.

{¶ 33} "In considering a defendant's claim that a jury verdict is against the manifest weight of the evidence, '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Williams*, 10th Dist. No. 10AP-779, 2011-Ohio-4760, ¶ 20, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Further, '[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Williams* at ¶ 20, quoting *Martin* at 175.

{¶ 34} "Unlike the standard of review for sufficiency of the evidence, 'a reviewing court does not construe the evidence most strongly in favor of the prosecution when using a manifest-weight standard of review.' " *Williams* at ¶ 21, quoting *State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, ¶ 81 (2d Dist.). "A manifest weight of the evidence challenge 'questions the believability of the evidence and asks a reviewing court to determine which of the competing inferences is more believable.' However, an appellate court 'may not substitute its judgment for that of the trier of fact on the issue of the credibility of the witnesses unless it is patently apparent that the factfinder lost its way.' " *Williams* at ¶ 21, quoting *Woullard* at ¶ 81.

{¶ 35} R.C. 2911.01(A) defines aggravated robbery as follows:

> No person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
>
> (1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;

* * *

> (3)   Inflict, or attempt to inflict, serious physical harm on another.

{¶ 36} The offense of aggravated murder is defined under R.C. 2903.01(B), which provides in relevant part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit * * * aggravated robbery."

{¶ 37} "Criminal attempt" has been defined as " 'an act or omission constituting a substantial step in a course of conduct planned to culminate in [the actor's] commission of the crime.' "  (Brackets sic.)  *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, ¶ 101, quoting *State v. Woods*, 48 Ohio St.2d 127 (1976), paragraph one of the syllabus, *judgment vacated on other grounds*, 438 U.S. 910 (1978).  "A 'substantial step' requires conduct that is 'strongly corroborative of the actor's criminal purpose.' "  *Group* at ¶ 101, quoting *Woods* at paragraph one of the syllabus.  Accordingly, in order to commit the offense of attempted murder as defined in R.C. 2923.02(A) and 2903.02(B), one must purposely or knowingly engage in conduct that, if successful, would result in the death of another as a proximate result of committing or attempting to commit an offense of violence.

{¶ 38} Appellant concedes the evidence produced by appellee at trial, if believed, is sufficient to sustain each of his convictions beyond a reasonable doubt.[1]  The evidence produced by appellee, when viewed in appellee's favor, supports a finding beyond a reasonable doubt that appellant discharged a firearm into a vehicle occupied by the two victims, killing one of them, and that a handgun belonging to one of the victims was taken from the vehicle during the incident.  Such evidence is sufficient to convict appellant of each of the offenses for which he was convicted.

{¶ 39} Appellant claims, however, that Matthews' testimony is totally unworthy of belief because it was secured by appellee pursuant to a generous plea agreement which essentially permits Matthews to escape punishment.  Appellant contends that Matthews' prior conviction for providing false information to police casts further doubt on the veracity of his account and that Matthews clearly minimized his involvement.  Appellant further

---

[1] The trial court denied appellant's Crim.R. 29 motion for acquittal, and appellant has not assigned trial court error with respect to that ruling.

maintains that, absent Matthews' testimony, there is insufficient evidence to convict appellant.

{¶ 40} Appellant further contends certain inconsistencies in the testimony of McGhee and Matthews also rendered their testimony suspect. For example, appellant points out Matthews testified he used the front door when he went out to meet Allen and that he came back through the same door, followed by appellant, after the shooting. Appellant argues his testimony is inconsistent with McGhee's claim that Matthews and appellant went out the back door and came back together through the back door. Finally, appellant argues the testimony of the coroner regarding the wounds to Allen's body belies Matthews' testimony about the events surrounding Allen's murder. Our review of the record reveals appellant's argument lacks merit.

{¶ 41} With regard to Matthews' testimony, as we stated in connection with appellant's second assignment of error, the jury was properly instructed as to the weight and credibility afforded to the testimony of an accomplice. The trial court also instructed the jury that "if any witness was shown to have had a prior criminal conviction on their record or a felony or a crime involving dishonesty or a false statement, you may consider such convictions to the extent they bear on the witness's believability or credibility as a witness in this trial." (Tr. Vol. IV at 35.) Thus, the jury was made fully aware of their responsibility to judge the credibility of Matthews' testimony.

{¶ 42} We disagree with appellant's assertion that the jury was required to disbelieve Matthews because his testimony against appellant was procured by appellee pursuant to a plea agreement that permitted Matthews to plead guilty to a lesser charge and avoided a lengthy prison term if convicted of the charges in the indictment. In *State v. Connally*, 10th Dist. No. 16AP-53, 2016-Ohio-7573, appellant argued his convictions of aggravated burglary, aggravated robbery, robbery, and kidnapping were against the manifest weight of the evidence. His convictions were based in large part on the testimony of a witness who admitted involvement in one of the robberies and had pleaded guilty to a lesser offense in return for his testimony against appellant. In rejecting appellant's manifest weight argument, this court set forth the relevant law as follows:

> [I]t was within the province of the jury to believe [the co-conspirator's] testimony in spite of his admitted involvement in the home invasion and plea agreement with the state. *See*

> *State v. Berry*, 10th Dist. No. 10AP-1187, 2011-Ohio-6452, ¶ 18 (noting the jury is in the best position to assess the credibility of a codefendant), citing *State v. Woodward*, 10th Dist. No. 03AP-398, 2004-Ohio-4418, ¶ 20.  [The co-conspirator's] testimony "was not so incredible as to render appellant's convictions against the manifest weight of the evidence." *Berry* at ¶ 18, citing *State v. Thompson*, 10th Dist. No. 07AP-491, 2008-Ohio-2017, ¶ 34.

*Id.* at ¶ 41.

{¶ 43} Similarly, in *State v. Harris*, 10th Dist. No. 17AP-350, 2018-Ohio-3872, appellant's conviction of welfare fraud was predicated almost entirely on the testimony of his accomplices.  In that case, appellant argued on appeal that the accomplices' testimony was unworthy of belief because they each received generous plea deals in return for their testimony against appellant.  *Id* at ¶ 33.  In rejecting appellant's manifest weight argument, we noted the jury had been properly instructed on the credibility and weight customarily afforded to accomplice testimony.  *Id.*  We also noted the jury had been made aware of the charges against the accomplices, the charges of which they were convicted, and the sentence they received in return for their testimony.  *Id.*  Accordingly, we held the record did not support appellant's contention that the jury lost its way in determining the weight and credibility afforded to the testimony of appellant's accomplices and in finding appellant guilty.  *Id.* at ¶ 34.

{¶ 44} Here, the evidence shows the jury was made aware of the credibility issues with regard to Matthews' testimony.  Matthews acknowledged the existence of the plea agreement, that he faced a maximum prison sentence of only three year under the agreement, and that it was possible he could be released on probation without serving any time in state prison.  In his closing argument, the prosecutor acknowledged there were credibility issues that the jury would need to resolve regarding Matthews.  The closing argument of appellant's trial counsel emphasized the various reasons why Matthews was not to be believed.  As previously stated, the jury was properly instructed as to the appropriate means and methods they should employ in determining Matthews' credibility.  In our opinion, Matthews' testimony was not so incredible as to render appellant's convictions against the manifest weight of the evidence.

{¶ 45} Moreover, a great deal of Matthews' testimony was corroborated by Manns and McGhee.  For example, McGhee corroborated Matthews' assertion that appellant was

armed with a handgun when he arrived at the 6th Avenue address on the night of the shooting. The description of the handgun matches the Glock semi-automatic Matthews observed appellant carrying when he arrived at Matthews' home on 6th Avenue. Each of the five 9 mm shell casings found at the crime scene were fired from a Glock semi-automatic handgun. McGhee also corroborated Matthews' testimony about meeting appellant at the Napoleon Avenue address and appellant's use of McGhee's phone to broker the prospective marijuana purchase. She also testified appellant was wearing a black hoodie. On this record, we find the conflict between McGhee's testimony and Matthews' testimony as to which door Matthews and appellant used to exit the home before the shooting and which door they reentered the home after the shooting is but a minor inconsistency the jury was entitled to resolve in determining the relative credibility of the two witnesses. The more critical events occurred outside the home, leaving Matthews and Manns as the only witnesses.

{¶ 46} In this regard, Manns corroborated some of Matthews' testimony regarding the sequence of events that took place on the night in question. Manns testified that Matthews was the first man to approach the vehicle and that he spoke with Allen about the marijuana for a few minutes before the second man, later identified as appellant, approached from behind Matthews and stood nearer to Allen after opening the passenger door. Manns' description of appellant's attire was also similar to Matthews' description of appellant's attire on the evening in question. Though Manns arguably testified he saw Matthews pointing a handgun, his testimony was somewhat confusing, and he gave no description of the gun.

{¶ 47} Moreover, Manns' testimony did not preclude a jury finding that appellant was the shooter, given the fact that appellant returned to the home with two weapons, a .38 revolver and the Glock he had been seen carrying when he arrived at the 6th Avenue residence. Similarly, while Manns testified he heard a gun cock and shots fired, he did not see a weapon discharge. Manns testified plainly that no shots were fired until the second man approached the passenger side of the vehicle and swung the door open.

{¶ 48} Appellant nevertheless contends the testimony of Manns and the deputy coroner supports a finding that the shots were fired by a perpetrator standing where Matthews must have been standing as the shots were fired. However, Dr. Gerston opined

only that the victim's wounds were consistent with the victim being seated in a vehicle with the assailant standing outside the passenger compartment and shooting into the vehicle. He was not asked to give an opinion on the exact location of the shooter, nor was he asked to assume Matthews was standing in a particular position at the time the shots were fired.

{¶ 49} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "Accordingly, we afford great deference to the jury's determination of witness credibility." *State v. Albert*, 10th Dist. No 14AP-30, 2015-Ohio-249, ¶ 14. "Mere disagreement over the credibility of witnesses is not a sufficient reason to reverse a judgment on manifest weight grounds." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 25, *appeal not allowed*, 140 Ohio St.3d 1455, 2014-Ohio-4414, citing *State v. G.G.*, 10th Dist. No. 12AP-188, 2012-Ohio-5902, ¶ 7.

{¶ 50} The jury was in the best position to assess Matthews' credibility and to resolve conflicts in the evidence. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we cannot say, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Williams* at ¶ 20.

{¶ 51} For the foregoing reasons, we hold the jury verdict was not against the manifest weight of the evidence. Accordingly, we overrule appellant's first assignment of error.

## IV. CONCLUSION

{¶ 52} Having overruled appellant's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and DORRIAN, JJ., concur.

_____