[Cite as *State v. Morgan*, 2024-Ohio-2875.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                               :

    Plaintiff-Appellee,                  :

                                No. 23AP-242

v.                                           :          (M.C. No. 2022CRB-6352)

Kevin D. Morgan,                             :          (REGULAR CALENDAR)

    Defendant-Appellant.                 :

D E C I S I O N

Rendered on July 30, 2024

**On brief:** *Zachary M. Klein*, City Attorney, *Melanie R. Tobias-Hunter*, and *Orly Ahroni*, for appellee. **Argued:** *Orly Ahroni*.

**On brief:** *Mitchell A. Williams*, Public Defender, and *George M. Schumann*, for appellant. **Argued:** *George M. Schumann*.

APPEAL from the Franklin County Municipal Court

LELAND, J.

{¶ 1} Defendant-appellant, Kevin D. Morgan, appeals from a judgment of conviction and sentence entered by the Franklin County Municipal Court following a jury trial in which he was found guilty of aggravated menacing.

**I. Facts and Procedural History**

{¶ 2} On May 5, 2022, appellant was indicted on one count of aggravated menacing in violation of R.C. 2903.21. The indictment alleged conduct occurring on May 3, 2022.

{¶ 3} The matter came for trial before a jury beginning March 21, 2023. The first witness for the state was Zachariah Adkins, "a police officer with the City of Columbus." (Mar. 21, 2023 Tr. at 76.) Adkins testified that, after his regular work shift ended on May 3, 2022, he left the police substation on Clime Road at approximately noon.

{¶ 4}   Adkins began to drive home, traveling on Georgesville Road toward I-270. He "made [a] left-hand turn off Clime Road onto Georgesville," traveling southbound. (Mar. 21, 2023 Tr. at 77.)  Adkins was in the "left-hand lane" of the "two lanes traveling southbound." (Mar. 21, 2023 Tr. at 77.)  He came to a stop at a red light, and a semi-truck was "in the right-hand lane." (Mar. 21, 2023 Tr. at 77.)  Directly in front of Adkins in the left-hand lane was a "full-size black SUV." (Mar. 21, 2023 Tr. at 79.)  At trial, Adkins identified appellant as the individual he observed in the black SUV that day.

{¶ 5}   When the light turned green, Adkins and appellant both "accelerate[d], doing the same thing to get in front of the semi to get on the freeway." (Mar. 21, 2023 Tr. at 77.) Adkins testified: "We both accelerated, * * * got onto the entrance ramp to get onto the freeway.  As we got on the entrance ramp, he brake-checked me.  After he brake-checked me, I looked up into his window, and he's waving a full-size black handgun out of the back window." (Mar. 21, 2023 Tr. at 77.)

{¶ 6}   Both vehicles then proceeded onto I-270, and Adkins "stayed back thinking he'd just take off or go wherever he needed to go," but "[t]hat's not what happened." (Mar. 21, 2023 Tr. at 77.)  Appellant "maintained" a speed of "45, 50 miles an hour rather than getting up to freeway speeds." (Mar. 21, 2023 Tr. at 77-78.)  Adkins then "hammered down on the gas pedal" and began to pass appellant's vehicle.  (Mar. 21, 2023 Tr. at 78.) Adkins testified that, as he was passing appellant's vehicle, he looked in the side window and observed appellant "pointing the gun directly at me." (Mar. 21, 2023 Tr. at 78.)

{¶ 7}   Adkins made a "distress call" while driving, informing the dispatcher that he observed a handgun. (Mar. 21, 2023 Tr. at 82.)  Adkins testified he felt threatened at the time and believed his life was in danger and made the distress call because "I * * * just had a firearm pointed at me." (Mar. 21, 2023 Tr. at 82.)  Adkins testified he felt fearful during the events because he "didn't * * * know what [appellant's] intentions were." (Mar. 21, 2023 Tr. at 85.)  Shortly after Adkins made the distress call, police officers initiated a traffic stop of appellant's vehicle.

{¶ 8}   Adkins stated the incident occurred "[a]round noon," and "[i]t was clear skies, sunny." (Mar. 21, 2023 Tr. at 80.)  When Adkins first observed the weapon, he was "[m]aybe two car lengths" behind appellant's vehicle. (Mar. 21, 2023 Tr. at 80.)  Adkins

next observed the weapon when appellant was "[j]ust the lane right to the next of me, * * * maybe 10 feet" away. (Mar. 21, 2023 Tr. at 80.)

{¶ 9} On cross-examination, Adkins stated he was "[o]ne hundred percent positive it was a firearm" he observed in appellant's hand. (Mar. 21, 2023 Tr. at 88.) Adkins testified that, when appellant was "holding the gun through the center, I'm looking straight through the back window of his SUV." (Mar. 21, 2023 Tr. at 87.) On re-direct, Adkins stated he observed a black, "full-size handgun." (Mar. 21, 2023 Tr. at 88.) On re-cross, Adkins testified that appellant's window was "tinted, but * * * not tinted so dark that I couldn't see through them. I could plainly see that it was a full-size black handgun." (Mar. 21, 2023 Tr. at 89.)

{¶ 10} At trial, the parties stipulated to two photographs depicting a weapon recovered by police on May 3, 2022. Adkins testified he recognized the weapon. Plaintiff-appellee, State of Ohio, also introduced the audio of the 911 call made by Adkins on the date of the incident.

{¶ 11} Columbus Police Officer Thomas Livingston testified that, on May 3, 2022, he was on patrol "working a special duty assignment for the Wedgewood Village Apartments located on the West Side." (Mar. 22, 2023 Tr. at 97.) At around noon that day, Officer Livingston and his partner "heard Officer Adkins come across the radio in a panicked voice. We call it - - it's a 10 – 3. That's our code for officer in trouble." (Mar. 22, 2023 Tr. at 99.) Officer Livingston testified that Adkins reported "he was driving home when * * * the vehicle in front of him, a male was waving a gun around. When Officer Adkins tried to pass the male, the male continued to wave the gun and point it at Officer Adkins. Officer Adkins stated that he still had the vehicle in sight and needed cruisers to respond." (Mar. 22, 2023 Tr. at 99.)

{¶ 12} Officer Livingston and his partner located the vehicle and "initiated a traffic stop." (Mar. 22, 2023 Tr. at 99.) Another police cruiser also responded to the radio report. Adkins was at the scene and identified appellant as the individual "who pointed a gun at him." (Mar. 22, 2023 Tr. at 100.)

{¶ 13} After removing appellant from his vehicle, officers conducted a search of the SUV. Officer Livingston testified: "When I approached the vehicle, I saw a freshly placed gun magazine on the floorboard, sitting on top of some trash." (Mar. 22, 2023 Tr. at 100.)

During the vehicle search, Officer Livingston "opened up the glove box" and observed a "handgun inside the glove box." (Mar. 22, 2023 Tr. at 100.) He described the weapon as "a black semiautomatic full-size handgun." (Mar. 22, 2023 Tr. at 100.) At trial, Officer Livingston identified photographs depicting the firearm magazine as well as the handgun recovered from appellant's vehicle.

{¶ 14} On cross-examination, Officer Livingston testified the magazine "was on the floorboard of the vehicle on top of some other trash and debris." (Mar. 22, 2023 Tr. at 102.) The magazine "was in plain view." (Mar. 22, 2023 Tr. at 102.) On re-direct examination, Officer Livingston stated the weapon was accessible from the driver's seat "in arm's reach." (Mar. 22, 2023 Tr. at 103.)

{¶ 15} Appellant testified on his own behalf. On the date of the incident, appellant was driving to a doctor's appointment in Hilliard, and he "proceeded down Georgesville Road south, crossing Hall Road." (Mar. 22, 2023 Tr. at 116.) Appellant "got to the intersection of Parkwick and Georgesville," and "[t]here was a tractor-trailer on the right-hand side." (Mar. 22, 2023 Tr. at 116.) Appellant "passed that tractor-trailer because the left-hand lane was empty" so he "could pass up the tractor-trailer when the light changed." (Mar. 22, 2023 Tr. at 116.)

{¶ 16} After the light changed, appellant "proceeded to pass up the tractor-trailer." (Mar. 22, 2023 Tr. at 116.) Appellant testified that "[w]ithin a few seconds," he looked up in his rearview mirror "and a car had darted right behind me * * * and it was really close because we were both getting to the exit ramp." (Mar. 22, 2023 Tr. at 116.) Appellant "figured that he or she * * * would back off." (Mar. 22, 2023 Tr. at 116.) When the driver "did not back off," appellant "proceeded to slightly brake check them so they would back off." (Mar. 22, 2023 Tr. at 117.) Appellant testified "[h]e probably backed off maybe 10 feet or so, and then he came even closer, sped up and got so close to my back bumper that I could literally see his buzz cut and the white of his hair and the whites of his eyes through my tinted window in the rear." (Mar. 22, 2023 Tr. at 117.)

{¶ 17} Appellant stated the driver "proceeded to follow me down the ramp" as they regained speed, "[s]o I brake checked him harder the next time, and he kind of backed off and swerved off, * * * and he swerved out real hard to the left onto the freeway." (Mar. 22, 2023 Tr. at 117.) Appellant "thought he was gone," so he "got over into the middle lane from

the median." (Mar. 22, 2023 Tr. at 117.) Appellant then testified: "I happened to look in my rearview mirror, and I seen that same car coming up on my driver's side, and he was coming up at a high rate of speed." (Mar. 22, 2023 Tr. at 117.) Appellant stated: "I grabbed my cell phone, and I put it in my hand and I opened it up, and * * * as he came up on the side of me, I seen something black in his hand, but I couldn't get a picture taken because * * * for some reason, I just couldn't push the button. And then I realized it was on selfie and not on video where I could take a picture of it." (Mar. 22, 2023 Tr. at 117-18.)

{¶ 18} Appellant further testified: "[A]s soon as he seen me come up with my cell phone, he hit his brakes real hard and went behind me; and I couldn't see where he was behind me. And the next thing I know, he comes up on my passenger's side, right lane; so I slowed down, and he went ahead of me, jumped in the lane in front of me." (Mar. 22, 2023 Tr. at 118.) Appellant stated he then "put [his] cruise control on," and "I was speeding because I was trying to get to OSU." (Mar. 22, 2023 Tr. at 118.) Appellant "thought the situation was over," but he "happened to look up at my rearview mirror and I seen the police behind me flashing lights." (Mar. 22, 2023 Tr. at 118.) Appellant was "thinking to myself, * * * I just got busted for speeding because that stretch of 270 is notorious for the police to be out there." (Mar. 22, 2023 Tr. at 119.)

{¶ 19} Appellant then "noticed that same car in front of me start to pull over in front of me and park as well, * * * and then it came to my attention that I think the gentleman called the police and said that I was a drunk driver or something." (Mar. 22, 2023 Tr. at 119.) Appellant exited his vehicle with his "hands up." (Mar. 22, 2023 Tr. at 119.) The officers "came up and they cuffed me. And I said, [w]hy are you handcuffing me? * * * One officer said, [b]ecause you pointed a gun at an off-duty Columbus Police officer. And I said I didn't point a gun at anybody." (Mar. 22, 2023 Tr. at 120.) The officers asked appellant if he had a weapon and appellant responded, "Yes, I have a gun." (Mar. 22, 2023 Tr. at 120.) Appellant told the officers "it is unloaded in my glove box, and the magazine, which I said clip, is in the center console." (Mar. 22, 2023 Tr. at 120.)

{¶ 20} Appellant testified he was unable to reach over to the glove compartment from the driver's seat because of his "prosthetic leg - - once I get into my vehicle, my prosthetic leg actually locks me into the driver's seat and there's no way for me to move." (Mar. 22, 2023 Tr. at 123.) Appellant stated "[t]he only way that I can reach my gun * * *

from the glove box, is if I actually stopped the car, walked around to * * * the passenger side of the car and opened up and put the gun in the glove box." (Mar. 22, 2023 Tr. at 123.) According to appellant, "[t]here is no way anybody could see * * * from the rear view of my car" because "I had some custom adjustments made * * * to the rear and the rear passenger windows to put a mirror tint, a light mirror tint which would face from the outside along with the factory dark tint." (Mar. 22, 2023 Tr. at 124-25.) At trial, defense counsel introduced photographs of appellant's vehicle.

{¶ 21} On cross-examination, appellant stated the photographs of his vehicle "were taken yesterday" between 5:00 and 6:00 p.m. (Mar. 22, 2023 Tr. at 127.) When asked whether someone could see in the windows if they were close to the vehicle, appellant responded: "You have to be very, very, very close from the outside." (Mar. 22, 2023 Tr. at 129.) Appellant acknowledged the driver's side window of his vehicle is not tinted.

{¶ 22} Following deliberations, the jury returned a verdict finding appellant guilty of aggravated menacing. On April 12, 2023, the trial court conducted a sentencing hearing. By decision and entry filed April 12, 2023, the trial court imposed a fine of $100 and ordered the weapon be forfeited and destroyed. The trial court stayed the weapon forfeiture order pending appeal.

## II. Assignments of Error

{¶ 23} Appellant appeals and assigns the following two assignments of error for our review:

> [I.] The verdict of guilt as to aggravated menacing is against the manifest weight of the evidence.
>
> [II.] The trial court plainly erred in ordering the forfeiture of the Defendant's firearm as part of the sentence, because the trial court lacked statutory authority to order the forfeiture.

## III. Analysis

{¶ 24} Under his first assignment of error, appellant contends his conviction for aggravated menacing is against the manifest weight of the evidence. According to appellant, the testimony of Adkins was not credible, and appellant relies on his own testimony that he pointed a cell phone (rather than a handgun) at Adkins, and that he was unable to reach over from the driver's seat to the glove compartment (where a weapon was recovered) because his prosthetic leg restricted his range of movement.

{¶ 25} In reviewing a challenge to the manifest weight of the evidence, "an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Boyde*, 10th Dist. No. 12AP-981, 2013-Ohio-3795, ¶ 27, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Under Ohio law, "the trier of fact 'is free to believe or disbelieve all or any of the testimony,' * * * and * * * 'the weight to be given the evidence and credibility of the witnesses are primarily for the trier of facts.' " *State v. Douthitt*, 10th Dist. No. 18AP-547, 2019-Ohio-2528, ¶ 17, quoting *State v. Crosky*, 10th Dist. No. 06AP-655, 2008-Ohio-145, ¶ 78, and *State v. Thomas*, 70 Ohio St.2d 79, 79-80 (1982). A reviewing court "should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most ' "exceptional case in which the evidence weighs heavily against the conviction." ' " *Boyde* at ¶ 27, quoting *Thompkins* at 387, quoting *Martin.*

{¶ 26} In the present case, appellant was found guilty of aggravated menacing, in contravention of R.C. 2903.21. R.C. 2903.21(A) states in part: "No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person." Under Ohio law, a defendant acts knowingly "when, although not intending the result, he or she is nevertheless aware that the result will probably occur." *State v. Smith*, 10th Dist. No. 04AP-726, 2005-Ohio-1765, ¶ 28, citing *State v. Edwards*, 83 Ohio App.3d 357, 361 (10th Dist.1992). In general, "[t]he crime of aggravated menacing is triggered by a threat that intimidates or causes fear or apprehension by the recipient." *State v. Speer*, 10th Dist. No. 12AP-893, 2013-Ohio-5444, ¶ 15, citing *State v. Schwartz*, 77 Ohio App.3d 484 (12th Dist.1991.) A conviction for aggravating menacing does not require the state " 'to prove that the offender is able to carry out the threat or even that the offender intended to carry out the threat,' " but "[r]ather, 'the offender merely must have a purpose to intimidate or know that his conduct would probably intimidate.' " *State v. Shavers*, 12th Dist. No. CA2015-12-212, 2016-Ohio-5561,

¶ 7, quoting *State v. Russell*, 12th Dist. No. CA2011-06-058, 2012-Ohio-1127, ¶ 12, and *State v. Applegate*, 12th Dist. No. CA2013-08-070, 2014-Ohio-1697, ¶ 10.

{¶ 27} Appellant does not challenge the legal sufficiency of the evidence supporting his conviction, i.e., whether, upon viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. In this respect, testimony by a victim that a "defendant pointed a gun at him," and that the victim "feared for his safety" is sufficient to sustain a conviction for aggravated menacing. *State v. Rogers*, 1st Dist. No. C-190249 (Aug. 19, 2000). *See also State v. El-Hardan*, 2d Dist. No. 24293, 2011-Ohio-4453, ¶ 43 (recognizing that "[t]he act of 'pointing a deadly weapon would undoubtedly justify a jury in concluding that the accused had committed the offense of aggravated menacing[,]' " and that "merely displaying a weapon is enough to support a conviction for [a]ggravated [m]enacing when this act causes the victim to believe that the defendant will cause him serious physical harm"). (Citations omitted.)

{¶ 28} Regarding appellant's manifest weight challenge, the jury was faced with conflicting evidence whether appellant waved or pointed a weapon at Adkins, an off-duty police officer, and whether appellant knowingly caused Adkins to believe appellant would cause him serious physical harm. Appellant essentially contends his version of events was more believable than the testimony of Adkins. As set forth under the facts, appellant testified he pointed a cell phone at Adkins, and that the weapon found in his vehicle was inaccessible to him while driving because he could not reach over to the glove compartment due to physical restrictions. Appellant also challenges whether Adkins could have observed a weapon in his hand because of a tinted rear window.

{¶ 29} The jury, however, also heard testimony by Adkins that he observed appellant wave and point a black handgun at him during the events. Adkins testified he first observed the weapon when he was "two car lengths" behind appellant's vehicle. (Mar. 21, 2023 Tr. at 80.) Adkins next observed the weapon when appellant was "[j]ust the lane right to the next of me, * * * maybe 10 feet" away. (Mar. 21, 2023 Tr. at 80.) Adkins testified he was "[o]ne hundred percent positive" he observed a "full-size black handgun." (Mar. 21, 2023 Tr. at 88.) When appellant was stopped shortly after the incident, police officers conducted a search of appellant's vehicle and a black handgun was found in the glove compartment

and a firearm magazine was recovered from the floorboard. Adkins testified he recognized the weapon. While Adkins stated the rear window of appellant's vehicle was tinted, he further stated it was "not tinted so dark that I couldn't see through." (Mar. 21, 2023 Tr. at 89.) The record further indicates, as acknowledged by appellant at trial, the side window of appellant's vehicle is not tinted. The jury also heard the testimony of Officer Livingston, who stated the glove compartment was accessible from the driver's seat, i.e., "in arm's reach." (Mar. 22, 2023 Tr. at 103.)

{¶ 30} Adkins testified he felt fearful and threatened by appellant's conduct, believing his life was in danger, and the record indicates he immediately placed an officer in distress call. At trial, the jury heard the audio recording of Adkins' call to a police dispatcher, made contemporaneous with the events, during which Adkins reported observing a handgun. With respect to Adkins' "belief that appellant would cause [him] serious physical harm, the credibility of the trial witnesses was a matter for the jury to determine." *State v. Baugh*, 5th Dist. No. 2017AP030007, 2018-Ohio-857, ¶ 54, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 231, 2002-Ohio-2126.

{¶ 31} Under Ohio law, "a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version." *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 39, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19. Here, the trier of fact was in the best position to assess witness credibility and "to resolve conflicts in the evidence." *State v. Brightwell*, 10th Dist. No. 18AP-243, 2019-Ohio-1009, ¶ 50. In reaching that determination, the jury could have reasonably credited the testimony of Adkins that appellant waved and pointed a firearm at him during the road incident, and that appellant's conduct caused Adkins to believe he faced serious physical harm, i.e., that Adkins "took the threat of harm seriously." *Brook Park v. Ruzicka*, 8th Dist. No. 88990, 2008-Ohio-44, ¶ 14-15 (the appellant's conviction for aggravated menacing not against manifest weight of evidence where city presented credible evidence appellant pointed gun at officers and officers testified they took threat of harm seriously). *See also State v. McCrary*, 10th Dist. No. 10AP-881, 2011-Ohio-3161, ¶ 16-17 (the appellant's conviction for aggravating menacing not against the manifest weight of the evidence where trier of fact rejected appellant's version of events contending he had a cell phone in his hand and, instead, found

credible testimony of state's witnesses that appellant displayed a gun, causing them to believe appellant would cause them physical harm).

**{¶ 32}** Upon review of the record, and with deference to the jury's credibility determinations, we conclude this is not the exceptional case in which the evidence weighs heavily against appellant's conviction or that the trier of fact clearly lost its way and created a manifest miscarriage of justice. Accordingly, appellant's conviction for aggravated menacing was not against the manifest weight of the evidence.

**{¶ 33}** Appellant's first assignment of error is not well-taken and is overruled.

**{¶ 34}** Under his second assignment of error, appellant asserts the trial court committed plain error in ordering forfeiture of the firearm as part of the sentence. Appellant contends the trial court lacked statutory authority to order the forfeiture. Appellant acknowledges he did not object at the sentencing hearing to the trial court's forfeiture order, thereby waiving all but plain error.

**{¶ 35}** In general, "[f]orfeitures are not favored under the law and, whenever possible, forfeiture statutes must be construed so as to avoid a forfeiture of property." *State v. Christian*, 2d Dist. No. 25256, 2016-Ohio-516, ¶ 31, citing *State v. Lilliock*, 70 Ohio St.2d 23, 25-26 (1982). Under Ohio law, "R.C. Chapter 2981 permits the state to seek forfeiture of an offender's property through either a criminal process under R.C. 2981.04 or a civil process under R.C. 2981.05." *State v. Germany*, 1st Dist. No. C-130777, 2014-Ohio-3202, ¶ 17. With respect to forfeiture as part of a criminal sentence, "R.C. 2981.04(A) requires that the complaint contain a forfeiture specification, or if forfeiture is not reasonably foreseeable at the time the complaint is filed, that a forfeiture specification be provided in a Crim.R. 7(E) bill of particulars." *State v. Griffin*, 1st Dist. No. C-190369, 2020-Ohio-3707, ¶ 47. Under the relevant statutory provisions, " '[p]roperty subject to forfeiture' consists of 'contraband,' 'proceeds,' or 'instrumentalit[ies]' used in the commission of a felony and certain misdemeanors." *Germany* at ¶ 17, quoting R.C. 2981.01(B)(13) and 2981.02(A)(1) (a), (b), and (c).

**{¶ 36}** In raising a plain error challenge to the trial court's order that the weapon at issue be forfeited and destroyed, appellant argues that R.C. 2981.02(A)(1)(c)(ii) subjects an instrumentality used in the commission of a misdemeanor to forfeiture only if specifically authorized by a section of the Ohio Revised Code. Appellant maintains R.C. 2903.21, which

sets forth the offense of aggravated menacing, does not specifically authorize forfeiture of the handgun involved in his case. In support, appellant relies on *State v. McMeen*, 3d Dist. No. 13-14-26, 2014-Ohio-5482, ¶ 16 (finding firearm not subject to forfeiture under R.C. 2981.02(A)(3) where misdemeanor offenses charged under city ordinance did not specifically authorize forfeiture) and *State v. Poirier*, 2d Dist. No. 28849, 2021-Ohio-1743, ¶ 35 (reviewing court observing "[w]e have found no authority permitting a trial court to order the forfeiture of firearms in the absence of statutory authority, and the parties have not directed us to any").

**{¶ 37}** In response, the state concedes the trial court plainly erred in ordering the forfeiture of appellant's firearm in the absence of any statutory authority. The state therefore requests that this court modify the sentence or remand the matter for further proceedings.

**{¶ 38}** Upon review, we find merit with appellant's contention that, in the absence of statutory authority (and, in the context of the criteria required for forfeiture under R.C. Chapter 2981), the trial court plainly erred in ordering forfeiture of the weapon.

**{¶ 39}** We therefore sustain appellant's second assignment of error and remand this matter to the trial court to vacate the order of forfeiture.

**{¶ 40}** Accordingly, while we affirm the judgment of conviction for aggravating menacing, we reverse the trial court's order of forfeiture and remand for further proceedings.

## IV. Conclusion

**{¶ 41}** Based upon the foregoing, appellant's first assignment of error is overruled, appellant's second assignment of error is sustained, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment affirmed in part,*
*and reversed in part,*
*cause remanded.*

LUPER SCHUSTER and EDELSTEIN, JJ., concur.

―――――――――――